[L.A. No. 30830. Dec. 15, 1978.]

S. DOROTHY METZGER FOX, Plaintiff and Respondent, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

**COUNSEL**

Burt Pines, City Attorney, Thomas C. Bonaventura and Ronald J. Einboden, Assistant City Attorneys, and Mark C. Allen, Deputy City Attorney, for Defendants and Appellants.

Strumwasser & Leichter and Alexandra Leichter for Plaintiff and Respondent.

Fred Okrand, Jill Jakes, Mark D. Rosenbaum and Terry Smerling as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**NEWMAN, J.**—With regard to church-state relations the California declaration of rights proclaims *first,* "Free exercise and enjoyment of religion without discrimination or preference are guaranteed"; *second,* there shall be "no law respecting an establishment of religion"; *third,* "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." (Cal. Const., art. I, §§ 4, 24.) Yet for 30 years Los Angeles officials have authorized the illumination on the city hall of a huge cross—at first to honor the Christmas holidays and then also, during the 1970s, to honor Easter Sundays, both Latin and Eastern Orthodox.

■■■ In a taxpayer's suit the trial court issued a preliminary injunction against the city. Defendants appeal. We affirm. We agree with the trial court that the city should be enjoined from "[d]isplaying a lighted, single-barred cross on the Los Angeles City Hall by any means whatsoever, including, but not limited to, displaying through selective illumination of lamps or the arrangement of window blinds."

I

After admitting into evidence certain pleadings and declarations, the trial court found as follows: "The Court is satisfied from the evidence, including matters of common knowledge of which it may and does take judicial notice, that the single-barred cross is a symbol particularly pertinent to the Christian religion, and that while citizens of other religions or no religion may celebrate Christmas as a secular holiday, they do not customarily, if at all, use the symbol of the cross in such celebrations. It carries quite different connotations from the symbols of the Christmas tree and Santa Claus. In addition, the lighted cross on the City Hall is visible for many miles in many directions, and can be and is viewed by persons driving the freeways who do not see it in the context of other Christmas decorations and who may not participate in such celebrations at all. . . .

"While some of the resolutions adopted by the City Council contain self-serving recitals, such as that included in the resolution of March 21, 1973, that the display of the cross is predicated upon it[s] being a symbol of the spirit of peace and good fellowship toward all mankind on an inter-faith basis, other evidence, including matters of common knowledge of which the Court can and does take judicial notice, makes it clear that

the real purpose is a religious one. The letters and reports upon which the City Council's resolutions have been adopted, and particularly the practice of illuminating the cross to commemorate the eastern orthodox Easter in response to demands from members of that faith, and the nature of the symbol displayed, convince the Court that the purpose of the resolution is a religious one, notwithstanding some protestations to the contrary."

## II

Regarding church-state proscriptions in the United States Constitution the Court of Appeals for the 10th Circuit has observed, in a case allowing a lighted monolith on which religious symbols were inscribed: "[T]he Supreme Court has treated the Establishment and Free Exercise Clauses under various factual situations with perplexing diversity of views." (*Anderson* v. *Salt Lake City Corporation* (10th Cir. 1973) 475 F.2d 29, 31.) That observation pertains to the panoply of views set forth more recently in *Wolman* v. *Walters* (1977) 433 U.S. 229 [53 L.Ed.2d 714, 97 S.Ct. 2593];[1] see too *Eugene Sand & Gravel, Inc.* v. *City of Eugene* (1976) 276 Ore. 1007 [558 P.2d 338, 345], and the dissenting opinion of Denecke, C. J., *id.*, page 349.

Applying variously articulated formulas, several courts have approved illuminations or other displays that arguably were comparable to the Los Angeles cross. (See *Eugene Sand & Gravel, Inc., supra* [cross in hilltop park]; *Meyer* v. *Oklahoma City* (Okla. 1972) 496 P.2d 789 [cross at fairgrounds]; *Paul* v. *Dade County* (Fla.App. 1967) 202 So.2d 833 [cross on courthouse]; *Allen* v. *Morton* (D.C.Cir. 1973) 495 F.2d 65 [Pageant of Peace, including crèche]; *Lawrence* v. *Buchmueller* (1963) 40 Misc.2d 300 [243 N.Y.S.2d 87] [creche on school grounds]; *Chamberlin* v. *Dade County Bd. of Public Instruction* (Fla. 1962) 143 So.2d 21, 35 ["works of art created by the school children"].

Those opinions span 15 years. They reflect remarkably variant views. The facts of each dispute seem discrete. At least four courts relied wholly or partly on state constitutions that differ from California's. Our case is marked by the location, size, and visibility of the Los Angeles cross, and also by the additional facts we discuss below.

[1]Compare the Washington Post's comment of June 29, 1977, that appears in the magazine Liberty (Sept.-Oct. 1977) page 30: " '[T]he Court . . . was unable to muster a majority for any one view of how the First Amendment's bar against the establishment of religion should be interpreted.' " Also see Hastey, *High Court Waffles on Church-State Questions* (*id.*, Nov.-Dec. 1977) page 7.

### III

■   The California Constitution, like the United States Constitution, does not merely proscribe an establishment of religion. Rather, all laws *"respecting* an establishment of religion" are forbidden. (Italics added.) The California Constitution also guarantees that religion shall be freely exercised and enjoyed "without discrimination or preference." Preference thus is forbidden even when there is no discrimination. The current interpretations of the United States Constitution may not be that comprehensive.

Was there preference here? Certain members of the Eastern Orthodox community apparently thought so. The trial court observed: "[T]he wisdom of the founding fathers in proscribing governmental entanglement is illustrated by the difficulty the City Council found itself in when it was called to its attention that certain Christian groups celebrated Easter on a different date from other denominations. What would it do in response to demands for illumination of various symbols on other days of religious observance?"

On December 23, 1975 (the date this lawsuit was filed), the director of the city's public buildings bureau declared that "at past Easters, the City Hall building has been lighted in a manner evidencing the cross symbol used by the Easter Seal charitable campaign." Yet in 1973 no Easter Seal campaign was mentioned in the city council's authorizing motion. It spoke only of "an illuminated cross to commemorate Eastern Orthodox Easter."

On April 17, 1970, that same public buildings director, commenting on a 1957 council policy statement that proscribed discussion of religion at meetings in city-owned buildings, noted that the Orthodox request for an Easter cross "does appear to conflict with the spirit of said policy," though not with "the letter."

Relevant and ironically poignant are these words from a communication of April 9, 1972, to the city council: "We wish to express our family's sincerest appreciation for the acknowledgement shown the Orthodox faith by having the symbol of Christianity, the cross, displayed on the four sides of the city hall building on the eve of our Easter.

"As we drove from Glendale to midnight services at Saint Sophia Greek Orthodox Cathedral via the Pasadena freeway, we viewed the

Cross with deep emotion. We join many Orthodox faithful who also have similar sentiments. We are truly grateful."

The city hall is not an immense bulletin board whereon symbols of all faiths could be thumbtacked or otherwise displayed. Would it be justifiable, say, to allow only a Star of Bethlehem, a Star of David, and a Star and Crescent? The monolith the court dealt with in *Anderson* v. *Salt Lake City Corporation, supra,* displayed "the Ten Commandments and certain other symbols representing the All Seeing Eye of God, the Star of David, the Order of Eagles, letters of the Hebraic alphabet, and Christ or peace." (475 F.2d at p. 30.) Not included there, so far as a reader now can tell, were Coptic, Universalist, or Scientology crosses, the Buddhist wheel, Shinto torii, Confucian yang-yin, Jain swastika, Zoroastrian vase of fire, or Unitarian flaming chalice.

In the California Constitution there is no requirement that each religion always be represented. To illuminate only the Latin cross, however, does seem preferential when comparable recognition of other religious symbols is impracticable. *Evans* v. *Selma Union High School Dist.* (1924) 193 Cal. 54, 60 [222 P. 801, 31 A.L.R. 1121], declared *re* the Bible of King James, "If the Douai version and these other books [the Talmud, Koran, and teachings of Confucius] are not already in the library, we have no right to assume that they will not be added thereto in the future." Librarians quite easily can offset a potential for preference, but a city hall tower is much less tractable than are shelves of a school library.

The city attorney stressed the significance of "a 30-year backdrop of near total passivity and disinterest within a metropolis as religiously and philosophically diverse as Los Angeles. . . ." He urged that we treat as inescapable the conclusion that "if the challenged custom really conferred a measurable benefit upon religion, members of various sects and faiths would have either expressed a desire for equal recognition and aid or, in the alternative, lodge their objection to the practice of prejudicial sovereign endorsement."

We do not find in this record persuasive evidence of "disinterest" in Los Angeles. Indeed there may be complex and troubling reasons why residents who are non-Christian have chosen not to seek "equal recognition and aid or, in the alternative, lodge their objection."

## IV

The city attorney argued that official action as to the cross constituted no more than "participation in the secular aspects of the Christmas and Easter holidays." Yet he quoted public works committee reports, adopted by the city council in 1971 and 1973, reading in part as follows: "It is noted that this approval is predicated upon the display being a further symbol of the spirit of peace and good fellowship toward all mankind on an interfaith basis, particularly toward the eastern nations in Europe."

Action that effects the display of only a Latin cross does not constitute "interfaith" recognition. A gesture to "eastern nations in Europe" hardly demonstrates an interfaith concern for "all mankind." Compare Eisenberg, *Disproportionate Impact and Illicit Motive: Theories of Constitutional Adjudication* (1977) 52 N.Y.U.L.Rev. 36, 163 ("Some legislators have learned their lessons well, becoming quite sophisticated in drafting legislation that does not smack of sectarian purposes."); and see Note, *Sunday Closing Laws in the United States: An Unconstitutional Anachronism* (1977) 11 Suffolk L.Rev. 1089, 1111 ("Despite the opinions of the Supreme Court, a number of state courts have declared unconstitutional Sunday closing laws that exempt certain businesses or merchandise where such classifications are clearly unrelated to the objective of promoting a day of rest.").

*Allen* v. *Hickel* (D.C.Cir. 1970) 424 F.2d 944 is cited for the rule that "The Government may depict objects with spiritual content, but it may not promote or give its stamp of approval to such spiritual content." (*Id.,* at p. 948.) ■ We cannot conclude here that the city, particularly as to Easter holidays, did not "promote . . . such spiritual content." Easter crosses differ from Easter bunnies, just as Christmas crosses differ from Christmas trees and Santa Claus.

On December 18, 1975, the council adopted a report that stated, "Your Committee has considered this and feels upon advice of the City Attorney's representative that the use of the cross is symbolic of the Christmas season and as such is not a religious service." Mere display of the cross is clearly not a religious service. By no means, though, should we infer that it is not action respecting an establishment of religion. Governments must commit themselves to "a position of neutrality" whenever "the relationship between man and religion" is affected. (See *Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 226 [10 L.Ed.2d

844, 859, 83 S.Ct. 1560].) To be neutral surely means to honor the beliefs of the silent as well as the vocal minorities.

The order granting the preliminary injunction is affirmed. The case is remanded for appropriate further proceedings.

Tobriner, J., Mosk, J., and Manuel, J., concurred.

**BIRD, C. J.**—I concur in the judgment of the majority. I write separately to express the reasons that persuade me that both the California and United States Constitutions prohibit the City of Los Angeles from displaying a symbol unique to one religion on the face of the very building housing the representatives of all the people.[1]

I

Two sections of the California Constitution, article I, section 4 and article XVI, section 5, must be consulted. Article I, section 4 of the Constitution of the State of California provides in pertinent part: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed." The substance of this guarantee of religious freedom has appeared in our State Constitution since 1849.[2] Those who framed its language were hardly hostile to religion. Rather, they understood that individuals remain free to choose on matters of belief only so long as "the power and the authority of the state [are] never . . . devoted to the

---

[1]This case comes before the court today on appeal from the granting of a preliminary injunction below, restraining the City of Los Angeles from "[d]isplaying a lighted single-barred cross on . . . City Hall. . . ." It has long been recognized that an appellate court will reverse the granting of a preliminary injunction only if it finds an abuse of discretion by the trial court. (*Weingand* v. *Atlantic Sav. & Loan Assn.* (1970) 1 Cal.3d 806, 820 [83 Cal.Rptr. 650, 464 P.2d 106]; *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527, 528 [67 Cal.Rptr. 761, 439 P.2d 889]; *San Francisco Police Officers Assn.* v. *City and County of San Francisco* (1977) 69 Cal.App.3d 1019, 1022 [138 Cal.Rptr. 755].) The test on review balances two factors: "(a) whether or not greater injury will result to a defendant from granting a preliminary injunction . . . than to a plaintiff from its refusal and (b) whether there is a reasonable probability the plaintiff will ultimately prevail in the litigation." (*San Francisco Police Officers Assn.* v. *City and County of San Francisco, supra,* at p. 1022; see also Code Civ. Proc., § 526.) Considering the limited nature of appellate review of preliminary injunctions, I agree with my colleague Justice Newman that an abuse of discretion by the trial court has not been established as a matter of law.

Upon remand this case may yet proceed to trial on the merits. The importance and novelty of the issue, as well as considerations of judicial economy, convince me to review at some length the provisions of the state and federal Constitutions upon which respondent rests her objection to the display of the cross on City Hall.

[2]As adopted at the 1849 Constitutional Convention, article I, section 4 read, in

advancement of any particular sect or denomination." (*Gordon* v. *Board of Education* (1947) 78 Cal.App.2d 464, 472-473 [178 P.2d 488].)

In detailed and comprehensive language, the delegates to the 1849 Convention committed this state to the fundamental policy of neutrality in matters of religion. Their legacy to us was a society where religion is a matter of faith, not law. "By its express terms, what [art. I, § 4] mandates is the perpetual guaranty of the '[f]ree exercise and enjoyment' of religion; what it prohibits is 'discrimination' against, 'or preference' in favor of, one religion as opposed to another." (*Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596, 617 [127 Cal.Rptr. 244].) As the attorney general's office has noted, "It would be difficult to imagine a more sweeping statement of the principle of governmental impartiality in the field of religion." (25 Ops.Cal.Atty.Gen. 316, 319 (1955).) This court has recognized that governmental action that either "favors, fosters [or] establishes any religion . . ." or which "in any way, directly or indirectly, infringe[s] upon the free exercise rights of the people of this state" violates the strictures of article I, section 4. (*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 603 [116 Cal.Rptr. 361, 526 P.2d 513].)

Article XVI, section 5 is an equally emphatic ban on state support of religion. It provides in pertinent part: "Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public

---

pertinent part: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this State . . . ." The 1879 Constitutional Convention retained article I, section 4, but strengthened its language by substituting the word "guaranteed" for "allowed" in the article's first sentence. An explanation for the change, given by a delegate on the convention floor, is evidence for the power of the provision: "Mr. O'Sullivan: . . . I propose this amendment, because it is quite evident that the word 'allowed' conveys the idea that the right to disallow or deny exists. Now, sir, I deny that any Government or any power on earth has a right to grant or deny freedom of religious belief. . . . 'Guarantee,' therefore, is the proper word . . . ." (Debates and Proceedings, Cal. Const. Convention 1878-1879, p. 1171 (hereinafter cited as Proceedings).)

The present language of article I, section 4, *supra,* dates from its adoption by vote of the people on November 5, 1974, in conjunction with the repeal of article I, section 4 as formerly worded. In addition to minor editorial changes, the 1974 text adds a provision that "[t]he Legislature shall make no law respecting an establishment of religion." This sentence is virtually identical to the establishment clause of the First Amendment to the United States Constitution. In my view, this court need not decide today whether the California establishment clause differs in any respect from its federal counterpart since the more explicit prohibition of this state's free exercise clause against discrimination or preference is sufficient to question the display of a Latin cross on a city hall. I discuss the establishment clause problems raised by the display of the cross separately in part III of this opinion.

fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever . . . ."

This provision was new to the 1879 Constitution.[3] It does not mirror or derive from any part of the federal Constitution. By the force of article XVI, section 5, the California Constitution since 1879 has precluded the spending of *any* public money to directly support *any* religious group. The adoption of this ban on state or local aid to religion was especially significant in light of the fact that the 1879 Constitutional Convention rejected numerous proposals involving religion. These included requests for a legal framework that would acknowledge God as the source of civil authority, prohibit blasphemy, and allow Bible reading in public schools. (See Proceedings, *supra,* pp. 89, 120, 156, 217-218.) One such request stated that "a written Constitution should contain explicit evidence of the Christian character . . . of the State . . . ." (*Id.,* at p. 89.) The delegates chose instead to emphasize the separation of church and state by adding article XVI, section 5, and by retaining article I, section 4.[4]

In *California Educational Facilities Authority* v. *Priest, supra,* 12 Cal.3d 593, this court recently reaffirmed the principles that have long guided our interpretation of article XVI, section 5. As a general matter the court

---

[3]Numbered originally as article IV, section 30 in the 1879 Constitution, the provision was renumbered as article XIII, section 24 and amended on November 8, 1966. The present article XVI, section 5 is materially identical to its predecessors and was added on November 5, 1974. For convenience, all references below to this provision will be to article XVI, section 5.

[4]The 1879 convention also added a specific ban on state aid to sectarian schools. (Cal. Const., art. IX, § 8.)

The most extensive debate at the 1879 convention regarding article XVI, section 5 concerned whether to amend it to declare that nothing in the article prevented the state from granting aid to orphanages affiliated with religious orders. An amendment so providing was eventually adopted by the convention. (Proceedings, pp. 1272-1273.) But the debate made clear that the delegates worried greatly that a loophole was being opened through which religious sects, merely by affiliating themselves with orphanages, could qualify for state support:

"Mr. Stuart: I ask the gentleman if this [exception for aid to orphanages] will not open the treasury for others?

"Mr. Wilson: Not at all, sir. It does not extend any further than [aid to orphans]. This is the extent of the amendment. I am just as much opposed as any gentleman upon this floor to any union of church and state. But I do not look upon this as State aid to a church. It is for the orphans."

The explicit amendment to article XVI, section 5 necessary to allow state aid to church-sponsored orphanages thus testifies to the delegates' shared conviction that the article's ban on state aid to religion was otherwise total.

first noted that "the provision was intended to insure the separation of church and state and to guarantee that the power, authority, and financial resources of the government shall never be devoted to the advancement or support of religious or sectarian purposes. [Citation.]" (*Id.,* at p. 604.) The court emphasized that article XVI, section 5 forbids *all* forms of governmental aid to religion, whether that aid be in the tangible form of cash or in the intangible form of prestige and power. Article XVI, section 5 "bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes." (*Id.,* at p. 605, fn. 12.)[5]

Finally, the court carefully pointed out that under article XVI, section 5, "the fact that a statute has some identifiable secular objective will not immunize it from further analysis to ascertain whether it also" directly and substantially advances religion. (*Id.,* at p. 604.) Thus, in *Frohliger* v. *Richardson* (1923) 63 Cal.App. 209, 217 [218 P. 497], the court refused to allow public financing of the restoration of the San Diego Mission, even though the court acknowledged that historical as well as religious interests were served by the project. Similarly, in *County of Los Angeles* v. *Hollinger* (1963) 221 Cal.App.2d 154 [34 Cal.Rptr. 387], the court disapproved of public financing for a film of a religious parade depicting the life of Jesus Christ. The court acknowledged that the film had the secular purpose of publicizing county attractions in order to promote tourism. Nevertheless, the court denied that "a governmental body may expend funds collected by the exercise of its taxing powers in a fashion that so directly supports the religious beliefs and purposes of some of the many segments of our pluralistic society." (*Id.,* at p. 159.) Most recently, in *Johnson* v. *Huntington Beach Union High Sch. Dist.* (1977) 68 Cal.App.3d 1 [137 Cal.Rptr. 43], the court upheld the refusal of a school district to permit a voluntary student Bible study club to conduct its meetings on the school campus during the school day. The court noted at page 16 that "permitting the club to operate on campus implicates school authority and prestige behind the dissemination of religious dogma."

---

[5]In *California Educational Facilities Authority* v. *Priest, supra,* 12 Cal.3d 593, itself, the court upheld the constitutionality of a state act creating a public authority with the power to issue bonds to help private colleges finance new facilities. The court noted that no expenditure of state funds was required by the act since the participating colleges were to repay all bond issues and to bear all operating expenses. The court also was of the opinion that any benefits that accrued to religion were truly remote and incidental to the primary purpose of benefiting education. It was significant that all private colleges, sectarian or nonsectarian, were eligible for aid. Our case today is distinguishable in that public funds *are* being expended, and in that the benefits go directly to one and only one religion.

The attorney general's office has also often expressed its view that article XVI, section 5 "prohibits the use of any public funds to aid any religious or sectarian purpose . . . ." (37 Ops.Cal.Atty.Gen. 105, 107 (1961) [tax funds cannot be used to support the production of a dramatized version of the Gospel]; see also, 60 Ops.Cal.Atty.Gen. 269, 276 (1977) [sectarian institutions may not lease vacant classrooms in public schools to conduct religious education]; but see 43 Ops.Cal.Atty. Gen. 62 (1964).)

This review of article I, section 4 and article XVI, section 5, makes clear that our own state Constitution is committed to the principle of separation of church and state. The mutually reinforcing constitutional provisions have helped make this state one in which persons of different religious beliefs might live together in mutual tolerance and respect. With this background in mind, I proceed to apply the dictates of the California Constitution to the undisputed facts presented at the hearing below.

## II

For 30 years prior to 1975, the city council of Los Angeles authorized the Christmas display of a single-barred Latin cross on the tower of City Hall. The record discloses that the city council has authorized a similar display on Easter and Eastern Orthodox Easter in past years. The unconstitutionality of this practice crystallizes when we consider *what* is being displayed *where* and *when*. There is no question that the trial court was correct when it found that "the single-barred cross is a symbol particularly pertinent to the Christian religion." This religious symbol was customarily displayed upon City Hall on three of the religious holidays when the spiritual meaning of the cross is felt most deeply. Moreover, the cross was lit on the face of the city building which indicated government's sponsorship of the display in the clearest of terms.

When a city so openly promotes the religious meaning of one religion's holidays, the benefit reaped by that religion and the disadvantage suffered by other religions is obvious. Those persons who do not share those holidays are relegated to the status of outsiders by their own government; those persons who do observe those holidays can take pleasure in seeing the symbol of their belief given official sanction and special status.

The simple but crucial fact at issue is that the city government of Los Angeles has identified itself with the central symbol of one religion. As

judges, it is our unmistakable constitutional duty to protect those of other faiths or no faith from the coercion toward conformity that attaches to every official endorsement of any religion, particularly the majority religion. Our ancestors would ask nothing less of us. Having experienced religious intolerance themselves, they understood that faith flourishes more freely in a sanctuary protected from the dictates of the majority. City-sponsored display of the Latin cross invades that sanctuary. "The employment of publicly owned . . . property for a highly visible display of the character of the cross . . . necessarily permits an inference of official endorsement of the . . . religious beliefs which underlie that symbol." (*Lowe* v. *City of Eugene* (1969) 254 Ore. 518, 544 [463 P.2d 360, 363], decree set aside due to changed circumstances, *Eugene Sand & Gravel, Inc.* v. *City of Eugene* (1976) 276 Ore. 1007 [558 P.2d 338, 349].)

This court's judgment cannot be affected by appellant's suggestion that the preferential effect of the city's display of the cross is trivial. A towering cross on the city hall of this state's largest metropolis is hardly a sight to be overlooked. As James Madison warned: " '[I]t is proper to take alarm at the first experiment on our liberties. . . . Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects?" (*Engel* v. *Vitale* (1962) 370 U.S. 421, 436 [8 L.Ed.2d 601, 611, 82 S.Ct. 1261, 86 A.L.R.2d 1285], quoting Madison, Memorial and Remonstrance Against Religious Assessments.)

The city argues that no preference was given to any religion, since the purpose of displaying the cross was the wholly secular one of promoting "peace and good fellowship toward all mankind." *Whatever the city's subjective purpose,* an impermissible religious preference *has* objectively resulted. Had the city delivered its message by simply lighting the words "Peace on Earth" on City Hall, no constitutional questions would have been raised. Instead, the city chose to deliver its "secular" message through a religious vehicle. The medium *was* the message. Once the cross blazed from the top stories of City Hall, some individuals obtained the satisfaction of knowing their faith was officially approved. Others had to pursue their faith knowing that beliefs they did not share had received official blessing.

The city emphasizes that the cross was displayed on Christmas for 30 years prior to 1975 without complaint. However, far from indicating acceptance, such silence may bespeak only the hesitancy of religious

minorities to come forward to complain about the recognition given to the majority religion. Moreover, this court cannot overlook the concrete complaint presented to us by respondent. The guarantees of this state's Constitution exist to protect the lone dissenter, just as they exist to protect the religious freedom of the majority. It cannot sway us that others in years past have not submitted similar complaints. As the Court of Appeal noted below "mere longevity of custom does not in itself insulate a practice from constitutional scrutiny."

It is noteworthy that city officials have customarily authorized display of the cross *at their own initiative.* However, these same officials have not similarly taken it upon themselves to recognize the symbols or holidays of other religions. This is a clear act of preference in violation of article I, section 4.[6]

After repeated requests of a member of the Eastern Orthodox faith in 1970 and 1971, the city council authorized the display of an illuminated cross on or about Eastern Orthodox Easter. The city defends this display as a gesture of "inter-faith recognition." How are non-Christian religions "recognized" by the display of a cross on City Hall on two different dates on which various Christian sects observe Easter?

Since the display of a sectarian symbol on City Hall involves the City of Los Angeles in promoting the spiritual significance of one religion's holidays, article I, section 4 of the California Constitution has been violated. We must never forget that the religious freedom of every person is threatened whenever government associates its power with one particular religious tradition. The threat today may seem small, but the breach in principle is large.

Similarly, the city has violated the provisions of article XVI, section 5. There can be no doubt that "the power, authority, and financial resources" of the city government stand behind the illuminated Christian cross. (*California Educational Facilities Authority* v. *Priest, supra,* 12 Cal.3d 593, 604.) A sectarian symbol is placed on the top floors of City

[6]My colleague Justice Richardson suggests in his dissent (dis. opn., *post,* at p. 817) that no "preference is worked until the city has both received and rejected similar applications" from other religions for the display of their symbols. But surely a preference already results from the mere fact that some religions did not have to *apply* for recognition of their holidays. Moreover, the majority rightly object to the notion that the city may turn City Hall into a vast billboard for religious messages. Even if this were not found to be a preference for religion, it raises serious "establishment clause" questions under the state and federal Constitutions. These questions are discussed in part III of this opinion.

Hall at public expense and the religious beliefs for which the Latin cross stands are promoted through alliance with the good name and resources of the government housed in City Hall.

The city's actions cannot be found to be *entirely* free from "any direct, immediate, and substantial effect of advancing religion." (*Ibid.*) The religious impact of a cross superimposed on City Hall is certainly as direct and substantial as the religious impact of financing a film of a religious parade (*County of Los Angeles* v. *Hollinger, supra,* 221 Cal.App.2d 154) or of financing the restoration of the Mission of San Diego (*Frohliger* v. *Richardson, supra,* 63 Cal.App. 209, 217). Furthermore, the display of a cross on City Hall "implicates [governmental] authority and prestige behind the dissemination of religious dogma" just as much as the meeting of a Bible study group on school grounds implicates the school's authority and prestige. (*Johnson* v. *Huntington Beach Union High Sch. Dist., supra,* 68 Cal.App.3d 1, 16.) To refuse to find direct benefit to religion in the city's display of the Latin cross is either to engage in a legal fiction of startling proportions or to overrule, sub silentio, a consistent line of cases interpreting article XVI, section 5.

Those who argue that the amount of taxpayer funds expended to light the cross is so minimal[7] as to be beneath this court's notice, overlook two important considerations. First, article XVI, section 5 admits of no de minimis exception. The language is explicit: No "city . . . shall ever . . . pay from any public fund whatever, or grant anything to or in aid of any religious sect . . . ." Secondly, the prohibitions of article XVI, section 5 would come into play even if no funds were expended. The ban is on aid to religion in *any* form.

Our Constitution does not tolerate the intimate involvement of a city in promoting the religious symbol of various sects of one religion, and this court must be faithful to that mandate.

## III

Although the majority rests its decision solely on state constitutional grounds, I am persuaded that the display on Christian holidays of the Latin cross on Los Angeles City Hall violates the establishment clause of the First Amendment to the United States Constitution as well.[8]

[7]According to the director of the bureau of public buildings, the cost for lighting the cross for Christmas in 1975 was to be $103.

[8]As indicated above (fn. 2, *ante*), article I, section 4 of the California Constitution contains an establishment clause virtually identical to that of the First Amendment. In my

The framers of the First Amendment understood that " 'the rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand . . . .' "[9] To assure that individuals are free from governmental intrusion on matters of religion, the first sentence of our federal Bill of Rights declares absolutely "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

The language of the First Amendment prohibits "not simply . . . enactment[s] *establishing a church;* it forb[ids] all laws *respecting an establishment of religion.*" (Original italics.) (*McGowan* v. *Maryland* (1961) 366 U.S. 420, 442 [6 L.Ed.2d 393, 408, 81 S.Ct. 1101].) This sweeping prohibition testifies to the conviction of the founders that religious diversity cannot long thrive in an atmosphere fouled by the stale air of orthodoxy. Religion itself flourishes when faith is arrived at freely. Government prospers when it avoids involvement in the religious quarrels that have brought civil war to many nations, past and present. These are the twin policies served by the First Amendment. As the Supreme Court has stated, "Government . . . must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another . . . ." (*Epperson* v. *Arkansas* (1968) 393 U.S. 97, 103-104 [21 L.Ed.2d 228, 234, 89 S.Ct. 266]; accord *Everson* v. *Board of Education* (1947) 330 U.S. 1, 15 [91 L.Ed. 711, 723, 67 S.Ct. 504, 168 A.L.R. 1392]; *Zorach* v. *Clauson* (1952) 343 U.S. 306, 314 [96 L.Ed. 954, 962, 72 S.Ct. 697].)

In *Wolman* v. *Walter* (1977) 433 U.S. 229, 236 [53 L.Ed.2d 714, 725, 97 S.Ct. 2593], the United States Supreme Court reaffirmed the "tripartite test" which we must apply in determining whether government has impermissibly involved itself in matters of religion: "In order to pass muster, a statute must have a secular legislative purpose, must have a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive entanglement with religion." The tripartite test, though difficult of application, brings together a consistent line of Supreme Court cases. (See *Lemon* v. *Kurtzman* (1971) 403 U.S. 602,

view, since the display of the cross violates the First Amendment, we need not decide today whether the state establishment clause has any greater force.

[9]*Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 231 [10 L.Ed.2d 844, 863, 83 S.Ct. 1560] (conc. opn. of Brennan, J., quoting Representative Daniel Carroll of Md. during the debate upon the proposed Bill of Rights in the 1st Cong., Aug. 15, 1789, I Annals of Cong. 730).

612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105]; *Walz* v. *Tax Commission* (1970) 397 U.S. 664, 674 [25 L.Ed.2d 697, 704-705, 90 S.Ct. 1409]; *Epperson* v. *Arkansas, supra,* 393 U.S. 97, 107 [21 L.Ed.2d 228, 236]; *Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203, 222 [10 L.Ed.2d 844, 858].)

The trial judge found that the display of the cross on City Hall failed this tripartite test since it had an impermissible religious purpose *and* effect, and excessively entangled the city in religious matters.[10] I agree.

It is beyond dispute that the display on the Los Angeles City Hall tower of a symbol so replete with spiritual content as the Latin cross has a substantial impact, pro and con, on the religious feelings of many who view it.[11] As the United States Supreme Court has emphasized, "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." (*Engel* v. *Vitale, supra,* 370 U.S. 421, 431 [8 L.Ed.2d 601, 608].)

[10]However, this court need not presently judge the city's purpose in displaying the cross. According to a 1970 memorandum from the director of the bureau of public buildings, the lighting of a cross at Christmas and Easter was "not in religious tribute but more in a spirit of peace and good fellowship toward all mankind." Upon approving the display of the cross during Eastern Orthodox Easter, the public works committee of the city council noted in 1971 that its approval was "predicated upon the display being a further symbol of the spirit of peace and good fellowship toward all mankind on an inter-faith basis, particularly toward the Eastern nations in Europe." The city argues that these declarations must be accepted at face value. It is, of course, true that the courts hesitate to question the motives of other branches of government. But "[i]n contrast to the general rule that legislative motive or purpose is not a relevant inquiry in determining the constitutionality of a statute . . . , our cases under the Religion Clauses have uniformly held such an inquiry necessary . . . ." (*McDaniel* v. *Paty* (1978) 435 U.S. 618, 636, fn. 9 [55 L.Ed.2d 593, 607, 98 S.Ct. 1322, 1333] (conc. opn. of Brennan, J.).) Were it necessary to reach the question of purpose in this case, substantial grounds exist for affirming the trial judge's finding that the "real" purpose of the display was a religious one. The sectarian connotations of the cross are beyond dispute. The fact that the city chose to display the cross on three Christian holidays strongly suggests that those sectarian connotations were recognized and *intended* by city officials.

[11]In *Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 783-784, footnote 39 [37 L.Ed.2d 948, 969, 93 S.Ct. 2955], the Supreme Court warned against applying the "principal or primary effect" test in a way that would require "metaphysical judgments" between "primary" and "secondary" effects. "Our cases simply do not support the notion that a law found to have a 'primary' effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion." (*Ibid.*) The court then referred to its upholding of Sunday closing laws in previous cases, making clear that such laws "were upheld, not because their effect was, first, to promote the legitimate interest in a universal day of rest . . . and only secondarily to assist religious interests; instead, approval flowed

The particular and dramatic way in which the cross was lit on City Hall contributed to its substantial religious impact. This was not the creation of a "secular" Christmas scene, replete with Santas, reindeer, and trees. This was an isolated cross stretching for several stories atop City Hall tower. The religious symbol, visible from a distance, stood without qualification or explanation, like the cross atop a traditional church. The city made no significant attempt to cushion the feelings of those, such as respondent, who were offended by the use of their tax funds to display the symbol of a religion whose beliefs they did not share.

Further, whatever may be said for the secular nature of the Christmas holiday, the same cannot be argued for Easter. Easter Sunday is no more a legal holiday in this state than any other Sunday. To the extent that non-Christians observe the day, they do not typically share in the display of the Latin cross. Indeed, that the *spiritual* content of the cross is central to the *spiritual* significance of Easter is a matter of common knowledge. The appearance of governmental identification with one religious tradition is thus even greater at Easter than at Christmas.[12]

The display of the cross on Eastern Orthodox Easter has a substantial religious impact as well. The decision to display the cross on that holiday was taken after a member of the Orthodox religion requested such a display in 1971. The text of that request, reprinted in the record of the trial court below, makes abundantly clear the religious motivation of the writer: "It has come to my attention . . . that as night will fall on Civic Center April Tenth a giant cross . . . will welcome Easter for members of the Protestant and Roman Catholic faith whereas some two hundred thousand members of Eastern Orthodox faith . . . will be chanting their traditional 'Christ is Risen' on Sunday April 18th as Orthodox Easter is celebrated."

---

from the finding . . . that [such laws] had only a remote and incidental effect advantageous to religious institutions." The phrase "primary secular effect" therefore only roughly describes the test the Supreme Court itself applies. It would be more accurate to say that "any non-secular effect [of state action must] be remote, indirect and incidental." (Tribe, American Constitutional Law (1978) 840, italics omitted.) Official acts must be free from any "substantial religious impact" in advancing or inhibiting religion. (*Allen* v. *Morton* (D.C.Cir. 1973) 495 F.2d 65, 87 (conc. opn. of Leventhal, J.).)

[12]The Court of Appeal in this state has previously held unconstitutional the Governor's executive order closing state offices from noon to 3 p.m. on Good Friday and allowing state employees paid time off. (*Mandel* v. *Hodges, supra,* 54 Cal.App.3d 596.) On March 24, 1978, the United States Supreme Court also stayed a judgment by a federal court of appeals that would have allowed the State of New Hampshire to lower its flags to half-mast in commemoration of Good Friday. (*Brown* v. *Thompson* (1978) 435 U.S. 938 [55 L.Ed.2d 535, 98 S.Ct. 1515.]

Though it proved too late to grant this request in 1971, the city council authorized the display of the cross on Orthodox Easter beginning in 1972. The council did preface its authorization by stating that the event was only "a further symbol of the spirit of peace and good fellowship toward all mankind on an inter-faith basis, particularly toward the eastern nations in Europe." However, this declaration, characterized by the trial court as "self-serving," cannot alter the fact that the city council henceforth was engaged in displaying a sectarian symbol on a holy day having no independent secular significance. The only effect of the city's action was to equalize the recognition bestowed upon various branches of Christianity. Clearly, such an extension of recognition to another Christian sect only reinforces the conclusion that the City of Los Angeles was furthering one particular religion.

Appellant contends that the federal Court of Appeals decision in *Allen* v. *Morton, supra,* 495 F.2d 65 governs since the display of a crèche or nativity scene in the Ellipse across from the White House was found not to violate in and of itself the First Amendment. However, the reasoning of the court in *Allen* advances the view that the cross, as displayed by the City of Los Angeles, does have a substantial religious impact.

In an earlier proceeding, the *Allen* court remanded the case for an evidentiary hearing to determine whether the display of the crèche had any substantial religious impact. (*Allen* v. *Hickel* (D.C.Cir. 1970) 424 F.2d 944, 950.) The court declared "we cannot say . . . on the record before us . . . that it is conclusive beyond dispute that the visual impact of the crèche does not entail substantial religious impact. Nor can we say . . . that it is impossible to present the crèche and other holiday symbols in a manner designed to obviate or at least minimize offense to the sensibilities of citizens who are offended . . . . Perhaps an appropriate accompanying plaque, rather than a mere explanation in pamphlets with lesser circulation, might serve . . . to allay the impression of Government sponsorship of religious belief. . . ." (*Id.,* at pp. 949-950.)

On remand, the district court held that the display of the crèche did not involve substantial religious impact. While reversing the district court on "entanglement" grounds, the Circuit Court of Appeals agreed. The court noted that the explanatory plaques, suggested in its first opinion, had been put in place. The court also noted that "the creche should not be considered in isolation but as an integral part of" a pageant whose purpose was to show how the American people celebrate Christmas. (*Allen* v. *Morton, supra,* 495 F.2d 65, 74.)

However, in the present case the City of Los Angeles chose to display the *isolated* Latin cross on the top stories of City Hall.[13] The *Allen* case suggests that, absent the qualifications inherent in plaques and surrounding secular symbols, the display of a religious symbol alone *does have* substantial impact in advancing and inhibiting religious belief. Therefore, the *Allen* case supports this court's decision.

The administrative and political difficulties spawned by anything more than minimal governmental involvement in the affairs of religion is considered in the "excessive entanglement" test. "Entanglement" first emerged as a separate doctrinal requirement in *Lemon* v. *Kurtzman, supra,* 403 U.S. 602, 616-620, 622-624 [29 L.Ed.2d 745, 757-760, 761-762]. The Supreme Court scrutinized aid to education programs which required states to monitor the use to which their funds were put by religious schools. The tying of state aid to state surveillance was found impermissible under the First Amendment if the state became involved in monitoring the programs of schools whose religious and secular functions were inseparable. The court concluded that government had no business intruding in the everyday policy decisions of church-related institutions.

More importantly for our purposes, the *Lemon* court noted the dangers of political division along religious lines in regard to such aid to education programs. (*Id.,* at pp. 622-624 [29 L.Ed.2d at pp. 761-762].) The annual debate on appropriations, the pressure to increase support as costs grow each year, threatened to turn religion and religious differences into central political issues. This was the *precise danger* the establishment clause was originally meant to prevent. As Justice Harlan wrote in *Walz* v. *Tax Commission, supra,* 397 U.S. 664, 694 [25 L.Ed.2d 697, 716], the establishment clause precludes "that kind and degree of government involvement in religious life that, as history teaches us, is apt to lead to strife and frequently strain a political system to the breaking point." (See also *Committee for Public Education* v. *Nyquist, supra,* 413 U.S. 756, 797 [37 L.Ed.2d 948, 977] [". . . where the underlying issue is the deeply emotional one of Church-State relationships, the potential for seriously divisive political consequences needs no elaboration."].)[14]

---

[13]It is troubling that the display of a cross high on City Hall lends a certain church-like appearance to the building. I can presently see no way in which the display of a cross on City Hall could be arranged so as to be constitutional. When it comes to as spiritually laden a symbol as the cross, the *Allen* court's emphasis on plaques and surrounding symbols may not suffice.

[14]The court has been most likely to find potential for political division when the state involvement with religion takes on a self-perpetuating quality. It was the prospect of

The United States Supreme Court has never ruled on the "entanglement" problems presented by the display of a religious symbol.[15] However, as with the "entanglement" found in *Lemon* v. *Kurtzman, supra*, 403 U.S. 602, 622-624 [29 L.Ed.2d 745, 761-762], the City of Los Angeles *has* opened itself up to successive requests for—and successive debates over—the display of religious symbols on its City Hall. This process has already started. The display of the cross on Easter triggered a request from a member of the Eastern Orthodox faith that "the same consideration be extended to members of Eastern Orthodoxy." Since a refusal of that request would have exposed the city to charges of favoritism, members of the city council were placed in the compromising position of granting a religiously motivated request. Where will this process end? It does not take foresight to see that this situation is fraught with dangers of political divisiveness. As the majority opinion points out, once the tower of City Hall is converted into a giant calendar, marked with symbols such as the Latin cross, the Jewish Star of David, the Moslem crescent and star, the Buddhist wheel, and the Hare Kirshna "Om," passions for and against one or another religion will have become part and parcel of the once neutral experience of travelling within sight of City Hall.

Moreover, the City Council of Los Angeles has no business deliberating on such questions as what symbols of other religions are equivalent to the cross and what holidays of other religions are equivalent to Christmas and Easter. These are questions whose answers the First Amendment reserves to the respective religions. The fact that the city council may have to answer already tells us that excessive entanglement is at hand. The trial court was correct when it found that "the wisdom of the founding fathers in proscribing governmental entanglement is illustrated by the difficul[ties]" the city council faces in responding to requests for displays of religious symbols on religious holidays.

annual, acrimonious appropriation debates that troubled the court in *Lemon* v. *Kurtzman, supra*, 403 U.S. 602 at p. 623 [29 L.Ed.2d 745 at pp. 761-762]. By contrast, the court found acceptable the permanent tax exemption granted to all religions, at issue in *Walz* v. *Tax Commission, supra*, 397 U.S. 664, 674 [25 L.Ed.2d 697, 704-705]. The exemption was categorical and did not necessitate state monitoring of the benefiting sects.

[15]The federal Court of Appeals did find "entanglement" problems raised by the membership of federal officials on the executive committee of the "Christmas Pageant of Peace." (*Allen* v. *Morton, supra*, 495 F.2d 65, 83 (conc. opn. of Leventhal, J.).) Those officials were put in the position of deciding whether removal of the creche from the pageant would be equivalent to "taking Christ out of Christmas." The Court of Appeal of this state has also found "entanglement" difficulties presented by the Governor's order closing state offices between noon and 3 p.m. on Good Friday. (*Mandel* v. *Hodges, supra*, 54 Cal.App.3d 596, 614-615.)

## IV

Since the display of a sectarian symbol on the Los Angeles City Hall involves that city in the promotion of one particular religious faith, it violates both the California and United States Constitutions. Religious freedom is one of our most cherished heritages. As judges sworn to uphold the constitution, we have no more solemn duty than to preserve this heritage for our children just as our ancestors preserved it for us. This we can only do by guarding against every governmental intrusion, large or small, into the inner sanctum of conscience.

Tobriner, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. In my opinion, the 30-year practice of the City of Los Angeles in arranging the window blinds, or illuminating the windows, of the city hall tower in the form of a cross on Christmas Eve, Christmas night and Easter violates neither the United States nor the California Constitution.

Plaintiff sued as a "private attorney general," complaining initially that the display was to occur on a single night, namely, Christmas Eve, December 24, 1975, but documents attached to the complaint refer to council approval of the display on December 24 and 25, 1975, as a "special event."

The precise charging allegations of the complaint are that the "resolution" offends "Article I, section 4 of the California Constitution, which provides in part, 'Free exercise and enjoyment of religion without discrimination or preference are guaranteed . . . . The Legislature shall make no law respecting an establishment of religion . . . .'" The complaint continues, "Said resolution [*sic*] also violates the establishment clauses of the First Amendment of the United States Constitution." The prayer of the complaint is revealing. In addition to her attorney's fees she seeks to restrain the city and its board of public works "from lighting a single bar cross on or in City Hall or any other municipal building or structure in the City of Los Angeles, commencing immediately; *in the alternative, the City of Los Angeles should be ordered to light on the City Hall any religious symbol* of any religion when a demand is expressed by any member of such religion." Plaintiff, judged by the prayer of her complaint, would be quite content, and the suit presumably may be dismissed, if the city illuminates *any* religious symbol upon demand. She

alleges neither that any such demand has ever been made nor, having been made, that it has ever been denied.

The case was submitted on the pleadings and seven declarations, those of plaintiff and of her attorney, and those made on behalf of the defendant city by five of its employees. The factual record, gleaned exclusively from the declarations, is exceedingly thin. Plaintiff's declarations, largely conclusionary, may be summarized. She alleged that the "Resolution and the actual lighting of the cross on City Hall is in violation of my constitutional rights under the First Amendment to the United States Constitution, which reads, inter alia, 'Congress shall make no law respecting an establishment of religion,' as well as in violation of my rights under California Constitution Article 1, § 4." She further averred that the city's resolution, and the lighting, "also affects my rights as a taxpayer, since the funds used to provide the lighting called for by said resolution would be derived from City Tax Dollars."

Defendant countered with declarations of city officials which stated that the purpose for the display of the cross on Christmas Eve, Christmas night and Easter was "not in religious tribute, but more in a spirit of peace and good fellowship toward all mankind." The reason for the display during the evening hours prior to Eastern Orthodox Easter was as a "further symbol of the spirit of peace and good fellowship toward all mankind on an inter-faith basis, particularly toward the eastern nations in Europe."

Defendant's supporting declarations further reveal that the arranging of the window blinds has continued for 30 years or more; the display's estimated annual cost to the city for 1975 was $103; the period of time involved in the illumination at Christmas was during the 12 evening hours of December 24 and 25, and at Easter of each year, a total of approximately 36 hours; more recently a group of Orthodox Christians had requested similar illumination on the eve of Orthodox Easter and this was granted; no other religious groups had ever made any similar requests but two charitable organizations, the heart and Easter seal funds, had requested and had been granted display of their respective symbols during charitable drives, a practice that is not challenged in this action; there was no evidence that the city had ever denied *any* similar requests to *anyone*; there was no evidence that in the 30 years of practice any particular religious impact, special or general, had been experienced, or that any member of the public or of any particular group, religious or otherwise, had been offended, misled, distracted, or disturbed by the

display, nor had any such person, group or organization complained of the practice.

Against this factual background the majority's constitutional argument may be examined. The majority, citing a "panoply of views" expressed in various opinions of the United States Supreme Court interpreting both the establishment and the free exercise clauses of the First Amendment of the United States Constitution, elects to place its holding upon the substantially identical provisions of the California Constitution (art. I, § 4). Given the similarity in language between the state and federal provisions, the same general standards should apply. (Accord *Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596, 616 [127 Cal.Rptr. 244].)

In its most recent application of the establishment clause, *Wolman* v. *Walter* (1977) 433 U.S. 229 [53 L.Ed.2d 714, 97 S.Ct. 2593], the members of the high court, while expressing various opinions regarding the ultimate result of the case before them, expressed no disagreement whatever as to the applicable standards: "The mode of analysis for Establishment Clause questions is defined by the three-part test that has emerged from the Court's decisions. In order to pass muster, a statute must have a secular legislative purpose, must have a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive government entanglement with religion. See *Roemer* v. *Maryland Public Works Bd.* 426 U.S. 736, 748 [49 L.Ed.2d 179, 96 S.Ct. 2337]; *Committee for Public Education* v. *Nyquist,* 413 U.S. 756, 772-773 [37 L.Ed.2d 948, 93 S.Ct. 2955, 2965-2966]; *Lemon* v. *Kurtzman,* 403 U.S. 602, 612, 613 [29 L.Ed.2d 745, 91 S.Ct. 2105, 2111] (1971)." (433 U.S. at pp. 235-236 [53 L.Ed.2d at pp. 724-725, 97 S.Ct. at p. 2599].) The foregoing tripartite test is now well established for determining whether a particular governmental action founders on the establishment clause, and I apply these analytical measures to the city's action in the case before us.

### 1. *Secular Purpose*

The prior reports of the city council and its public works committee reveal that the stated purposes were to symbolize the general holiday season, in a "spirit of peace and good fellowship toward all mankind on an interfaith basis . . . ." The display was coincident with installation of strings of colored lights, Christmas trees, and other ornaments in public buildings. Under these circumstances it seems to me readily apparent that the general purpose was secular and probably twofold in nature: (1) to promote a general spirit of peace, warmth, good fellowship, and good will

during what has become a traditional holiday period, characterized by the exchange of gifts and greeting cards and general secular festivity, and (2) to provide an attractive and relatively inexpensive decoration for the city hall tower to accompany the bright exterior lighting of adjacent and nearby buildings. While some of the intended tranquility, harmony, and good will, very unfortunately, may have been dissipated by the rancor and rhetoric of the present litigation, I find nothing in the factual record, or in any of the circumstances of which we may take judicial notice, which prevents us from accepting at face value the intended purposes expressed by the city officials. Certainly, there is nothing before us which indicates, even indirectly, that the city council had an undisclosed purpose or secret, conspiratorial plan to promote or advance a particular religion. We can fairly assume that it acted in complete good faith over many years.

As the majority acknowledges, the courts of other states have approved displays comparable to the cross at issue. (*Ante,* p. 795, and cases cited.) A recent case, helpful in understanding the term "secular purpose," involves the erection of a large permanent cross on public property in Oregon as a memorial to war veterans. (*Eugene Sand & Gravel, Inc.* v. *City of Eugene* (1976) 276 Ore. 1007 [558 P.2d 338].) The *Eugene* court reasoned, "Conceding that a large Latin cross is a religious symbol, it has been uniformly held that in determining the validity of the display of either a cross or a nativity scene on public property, the controlling question is not whether a cross or nativity scene is a religious symbol, but whether the *purpose* of its display is religious or secular. Thus, the requirement of [secular] 'purpose' is satisfied by displays of nativity scenes on public property in connection with the *Christmas season as a secular festival or pageant.* Indeed, *permanent displays of crosses* and other religious monuments on public property have been uniformly held valid . . . even *when displayed in connection with a secular festival or event.*" (P. 346, italics added, fns. omitted.)

I believe that the foregoing analysis of *Eugene* is sound, even when applied to a *permanent* display. A fortiori, it seems to me applicable to the *temporary,* decorative display of a cross to commemorate an important holiday season. Christmas, by very definition has obvious religious characteristics, but it has become, by general acceptance, an important secular festival as well. It is recognized by law as an official state holiday. (Gov. Code, §§ 6700, 18025.) In terms of business and community life, Christmas has developed strong, some say too strong, secular overtones. We depart from important precedent when we reject, on the barren

transcript before us, the reasons which local officials gave for their action. (*City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 777 [122 Cal.Rptr. 543, 537 P.2d 375]; *State of California* v. *Superior Court (Veta)* (1974) 12 Cal.3d 237, 258 [115 Cal.Rptr. 497, 524 P.2d 1281].) Moreover, we seriously err when we interrupt a local civic practice which is within the area of appropriate political discretion and judgment vested in local public officials.

### 2. *Principal or Primary Effect*

Apart from its secular purpose, was the principal or primary *effect* of the display of the holiday cross one which either promotes or inhibits religion? Undoubtedly not.

There is nothing whatever before us to show that the display had any effect, temporary or permanent, good, bad, or indifferent. The display stirred no visible passions for or against. Its impact, culturally, theologically, philosophically, or socially, was undisclosed. The 30-year practice has passed unchallenged either by the general public, or by any individuals or groups, religious or otherwise. Far from generating controversy, the display seems to have been received by the public either with favor in the spirit of the holiday season, or with general passive indifference or apathy. This fact prompted the majority of the Court of Appeal herein, quite properly, to observe, "The conclusion is inescapable that if the challenged custom really conferred a measurable benefit upon religion, members of various sects and faiths would either have expressed a desire for equal recognition and aid, or in the alternative, lodged their objection to practice of prejudicial sovereign endorsement . . . . [W]hatever benefits conferred by that custom are so remote and inconsequential that any threat posed to the First Amendment is hypothetical at best."

The record discloses that only two organizations sought display of similar symbolic expressions. They were both granted equal treatment. These were the heart symbol of the Heart Fund and the cross symbol of the Easter Seal Society. It is difficult to conclude that any preference is worked until the city has both received and rejected similar applications from someone.

It seems to me almost self-evident that the record before us discloses no "principal or primary effect" of the city's action on anybody, much less any effect which may fairly be interpreted as either promoting or

inhibiting religion. The evidence is entirely to the contrary. With the majority of the Court of Appeal, I would have thought that if the practice had the principal or primary effect of either promoting one religion or inhibiting others, it would have been reasonable to have expected in the course of 30 years the surfacing of *some* manifestation of that fact by complaints, petitions, or objections from *someone*. If we inquire, what does the record disclose as to the principal or primary *effect* which the display of the cross had on *millions* of people in the largest metropolitan area in California over a period of *30 years,* the answer is a thundering silence. The record before us totally fails to demonstrate that the display either encouraged or inhibited any particular religion in the Los Angeles area or anywhere else.

### 3. *Excessive Government Entanglement with Religion*

The display at issue herein cannot be said, reasonably, to foster an *"excessive* entanglement by government with religion." The United States Supreme Court in *Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756 [37 L.Ed.2d 948, 93 S.Ct. 2955], declared that it is well established "that not every law that confers an 'indirect,' 'remote,' or 'incidental,' benefit upon religious institutions is, for that reason alone, constitutionally invalid. [Citations.]" (P. 771 [37 L.Ed.2d p. 962].) The high court noted that among the "primary" evils against which the establishment clause was intended to protect, are " 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' [Citations.]" (*Id.,* at p. 772 [37 L.Ed.2d at p. 962].) In the case at hand the city did not enmesh itself in any religious program or favor any ecclesiastical organization.

As previously noted the lighted display of the cross involved an estimated expense of $103 annually. While the record does not reflect the size of the annual budget of Los Angeles, I believe it fair to conclude that the ratio of $103 to the budget may sink from minimal to infinitesimal. No claim is made that the practice interfered with any governmental operations or activities. This fact clearly distinguishes this case from *Mandel* v. *Hodges, supra,* 54 Cal.App.3d 596, in which releasing state employees for three hours on Good Friday was held to be an unconstitutional practice for it resulted in the virtual closing of certain state offices during office hours at a cost, statewide, of approximately $818,000 per hour.

Not only in terms of the funding involved but in the temporal aspects of the display as well, the city's action herein was minimal. This is not the permanent fixed installation of a cross such as was permitted in *Eugene.* Of the 365 days in the entire year, we are concerned only with the evening hours of 4 days. The case does not represent a religious benefit, preference, gain or advantage of any constitutional significance. Los Angeles has neither "excessively entangled itself with religion," nor imposed any "irreparable injury" upon plaintiff or others which would warrant injunctive intervention.

Beyond the immediate issues of the present case, however, I believe that the majority has adopted an analysis which is much too constricted and narrow in describing the proper relationship between the state and religion. While I agree with the majority's insistence that the state must assume a "position of neutrality" (*ante,* p. 798), I confess that I do not understand what is meant by the phrase "to be neutral surely means to honor the beliefs of the silent as well as the vocal minorities," for I do not know what those "beliefs" are. In my opinion we must "honor" and respect both the beliefs and the unbeliefs of the majority as well as the minorities. More importantly, however, the majority chooses to ignore a substantial body of law which has developed on the issue of "neutrality." A much more accurate, and constitutionally more current and acceptable, description of the posture of government vis-a-vis religion is one of "accommodating" or "benevolent" neutrality. (See Kurland, *The Supreme Court, Compulsory Education, and the First Amendment's Religion Clauses* (1973) 75 West Va. L.Rev. 213, 237; Note, *Constitutional Law-Religious Exercises and the Public Schools* (1967) 20 Ark.L.Rev. 320, 325; Note, *The Constitutionality of the 1972 Amendment to Title VII's Exemption for Religious Organizations* (1975) 73 Mich.L.Rev. 538, 551; see also Justice Douglas in *Zorach* v. *Clauson* (1952) 343 U.S. 306, 313 [96 L.Ed. 954, 961-962, 72 S.Ct. 679]; Chief Justice Burger, *Walz* v. *Tax Commission* (1970) 397 U.S. 664 [25 L.Ed.2d 697, 90 S.Ct. 1409].)

In *Roemer* v. *Maryland Public Works Bd.* (1976) 426 U.S. 736, 745-746 [49 L.Ed.2d 179, 186-188, 96 S.Ct. 2337], Justice Blackmun recently described the neutrality of the state's position as "scrupulous," but added, referring to church and state, that "a hermetic separation of the two is an impossibility it has never required." The Delaware Supreme Court in considering application of the establishment clause, described the principle in this manner: "The Establishment cases decided by the United States Supreme Court indicate that neutrality is the safe harbor in which to avoid First Amendment violations: neutral 'accommodation' of

religion is permitted [citations] while 'promotion' and 'advancement' of religion are not. [Citations.]" (*Keegan* v. *University of Delaware* (Del. 1975) 349 A.2d 14, 16, cert. den., 424 U.S. 934 [47 L.Ed.2d 342, 96 S.Ct. 1148].)

On principle, the "neutral" approach of government to religion should be understood as a detached, accommodating, accepting and benevolent posture lest "strict" neutrality be construed as hostility. Justice Douglas amplified this concept in *Zorach* insisting that the state should "accommodate" religion, and "To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe . . . . But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence." (*Zorach, supra,* 343 U.S. at p. 314 [96 L.Ed. at p. 962].) Justice Goldberg expressed a very similar view in *Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203 [10 L.Ed.2d 844, 83 S.Ct. 1560] (conc. opn.), by cautioning against any impression that strict neutrality meant hostility, urging that "untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it." (P. 306 [10 L.Ed.2d at pp. 905-906].)

In its role of "neutrality," while government may not advocate, advance, or sponsor religion or religious influence, it can and should accommodate religion and need be neither hostile nor inhospitable to it.

The analysis, as so frequently in the law, reduces itself to questions of degree. The United States Supreme Court in *Walz* v. *Tax Commission, supra,* 397 U.S. 664, put the matter this way: "We must also be sure that the end result—the effect—is not an excessive government entanglement with religion. *The test is inescapably one of degree* . . . the questions are *whether the involvement is excessive,* and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." (Pp. 674-675 [25 L.Ed.2d pp. 704-705], italics added.) The United States Court of Appeals, District of Columbia Circuit, echoed the same principle in *Allen* v. *Hickel* (D.C.Cir. 1970) 424

F.2d 944, in discussing the relationship of the state and religion: "The applicable rule may fairly be stated thus: The Government may depict objects with spiritual content, but it may not promote or give its stamp of approval to such spiritual content . . . . The duty of the courts is to strike the proper balance. The area is a sensitive one, involving *questions of degree. The question is not whether there is any religious effect at all, but rather whether that effect, if present, is substantial.*" (Pp. 948-949, italics added.) This is a sensible rule.

I do not believe that the record before us supports a conclusion that the degree of government involvement in religion is *substantial* or that by its practice the City of Los Angeles became "excessively entangled" in religion. Chief Justice Burger reminds us of a principle which may be fairly invoked at this point, "Short of those expressly proscribed governmental acts there is *room for play* in the joints productive of a benevolent neutrality . . . ." (*Walz, supra,* 397 U.S. at p. 669 [25 L.Ed.2d at p. 702], italics added.) In the matter before us, the circumstances of the very small expense involved, the rarity and extreme brevity of the display, its concurrence with traditional and festive secular as well as religious holidays, the absence of any record of an adverse impact on those of other religious faiths or on those of no faiths at all during the very extended period of the practice, in combination, all lead me to conclude that the government action was not excessive, but was actually minimal indeed. The practice in question falls very easily within the "room for play" permitted to local government. There is also room for mutual charity and tolerance. In this area, neither the federal nor the state Constitution requires total sterility.

The question has been put—how should the council reply to requests for displays of other symbols by other groups? Significantly, that issue has not arisen in 30 years and it is not before us now. However, the more direct response is, why should not the city council respond favorably? In doing so, reasonably, it would be recognizing, not advocating, some of the deepest impulses and strongly held beliefs of many of its citizens. A public entity controlled by principles of common sense, reason, and fairplay should have some leeway in this area, mindful always of the wise admonition of Justice Brandeis that "we must be ever on our guard lest we erect our prejudices into legal principles." To plaintiff's further warning that "The breach of neutrality that is today a trickling stream may all too soon become a raging torrent" the answer is, if there is a constitutional leak here it is exceedingly slow in developing. The rhetoric is not matched by the record.

The rich tapestry of our national life contains many interweaving threads of which one of the oldest and strongest is the religious faith of our people. The fabric contains multiple and diverse strands of profession, belief and practice. The influence of religion on the American consciousness is, at once, pervasive, historic, and beneficent. Were we to attempt, on misguided constitutional grounds, to effect a total and complete insulation of government from all religious influence and symbolism, we would have commenced no small undertaking. We would, to cite but a very few random examples, delete the reference to the Deity in the Preamble to our California Constitution, erase the likeness of George Washington at prayer from our postage stamps, remove the Biblical description of the Creator from the face of the current state telephone directory, strike the expression "In God We Trust" from all of our currency, sandblast the term "Anno Domini" from the very cornerstone of the public building in which these opinions are written, and muffle the prayer, "God save the United States and this Honorable Court" which convenes the only court to which our judgment may be appealed.

We should, more profitably, focus on the precise constitutional claim before us, and measure, in the light of the record before us, the *degree,* if any, of defendant's involvement in religion. If we do so, fairly and objectively, no basis will appear for plaintiff's contention that her "free exercise and enjoyment of religion" has been impaired, or that "The Legislature [has made any] law respecting an establishment of religion." Plaintiff has alleged no significant interference with her constitutional rights and we should say so.

The primary inquiry raised by plaintiff's private attorney general attack is whether the *degree* of government's involvement in religion can reasonably be said to be "substantial" or "excessive." I do not find it so in the case before us.

I would reverse the judgment.

**CLARK, J.,** Dissenting.—I concur in the opinion prepared by Justice Richardson respecting the substantive issues presented the court by this case. While neither of us voted to bring this matter before the court, it must now be dealt with. By additional statement, I find it necessary to comment on the majority opinion's failure to state either a definitive holding or a rationale.

We are constitutionally charged with stating reasons for our decisions. (Cal. Const., art. VI, § 14.) Not only am I unable to discern the majority's reasons, but also I fear its random discourse will confuse rather than guide the bench and bar in an area where four members of this court, having voted to grant the petition for hearing (Cal. Rules of Court, rule 29(b)), apparently felt definition needed.

The majority opinion is divided into four parts. Part I recites, without comment, trial court "findings"—in large part comprising conclusions of law.

Part II notes the Supreme Court has treated the establishment and free exercise clauses of the federal Constitution with " 'perplexing diversity of views,' " simply noting the guaranty of such rights in the California Constitution is not dependent on the federal Constitution. The opinion concedes that other courts have approved displays arguably comparable to the Los Angeles cross, but then adds that some of these cases may be distinguishable. But the distinguishable go undistinguished. No principle of law is stated.

Part III states the California Constitution guarantees exercise of religion without discrimination or preference—a more comprehensive prohibition than in the federal Constitution. In seeking to establish the cross constituted a preference, the majority speculate that "members of the Eastern Orthodox community apparently thought" there had been a preference, a city hall official thought there might be a conflict, and an Orthodox family was grateful for display of the cross on the city hall.[1] The majority acknowledge the California Constitution does not require "that each religion always be represented" in a public display of religious materials, but then opine to "illuminate only the Latin cross . . . does seem preferential."

Does part III hold there is an unconstitutional preference? If so, it is by implication only. No attempt is made to define a preference. All we are told is that the Constitution does not require every religion always be represented, but that to display a cross may be prohibited even though the records show the city has never rejected a request for a competing display. Part III further implies that if in fact there is a general lack of interest in challenging the display or in requesting other displays, there

---

[1]The majority appear to urge that the expression of a handful of persons who felt a religious impact from the display is to be weighed more heavily in the balance than the evident acceptance of the display by the remaining three million inhabitants of the city.

may not have been sufficient preference to invoke constitutional proscriptions. There is no assurance, however, that on remand the city would prevail if it made a proper showing. Nor do the majority advise what would be needed to make such a showing. Just where the line is to be drawn between permissible and impermissible display remains as obscure as the city's now darkened cross.

Part IV argues with the city's contention that the display was no more than a secular participation in Christmas and Easter holidays, generally shared by all residents of the city. Conceding the city may constitutionally depict objects with spiritual content,[2] the opinion denounces the instant display as "promoting" spiritual content. No attempt is made to distinguish between displaying and promoting. The opinion suggests the city might have engaged only in *displaying* if only their resolutions proclaiming a secular purpose had been enacted in good faith. But, placing itself in the councilmen's seats, our court appears to conclude the resolutions were fraudulent and thus the council's actual purpose was to surreptitiously and impermissibly promote a religion.

The opinion is further confused by its concluding statement. We are told the city must be deemed to have promoted religion because it did not honor the beliefs of persons never heard from.[3] Surely the majority do not suggest the council should initiate a program of hearings to ascertain these beliefs particularly when—according to the majority—the phantom protestors are disinclined to speak out on the subject.

I do not suggest our opinions should be written in a particular style (cf. Witkin, Manual on Appellate Court Opinions (1977 ed.) ch. V). Style is a highly personal matter to each of us. But the bench and bar are entitled to know from our written opinions not only that a judgment on appeal is being either affirmed or reversed, but also the majority's reasons therefor. "A conclusion in which the holding on the legal issue is clearly stated is . . . highly desirable. It is an important part of the reasoning and discussion: it states the governing rules of law that lead to the decision

---

[2] In *Protestants & Other Amer. Unit. for Sep. of Ch. & St.* v. *O'Brien* (D.D.C. 1967) 272 F.Supp. 712, the display of the Madonna and Child on a postage stamp issued at Christmas—surely having a more significant and preferential religious connotation than the lighting of the temporary cross—was held not to offend the federal constitutional proscription against the establishment of religion. (*Id.,* at p. 721.)

[3] It is, of course, unrealistic to presume, as the majority urge, that in a city of three million persons, the failure of but a few persons to make their views known during a thirty-year period is due to "complex and troubling" reasons which might have intimidated them from speaking out.

. . . and also serves as precedents." (Witkin, Manual on Appellate Court Opinions, *supra,* ch. V, p. 137.) Not only does the majority opinion in the instant case fail to state its reasons or conclusions—clearly or otherwise—but it also fails to advise the parties litigant what must be established or refuted on remand "for appropriate further proceedings" as have been ordered by the majority.

In sum, the majority's opinion fails to reveal that removal of the offending symbol is constitutionally required. In truth, it is required only by today's decree from five judges.