619 F.2d 1311
 Roger R. FLOREY, on his own behalf and on behalf of his
minor son, Justin B. Florey; David R. Groethe;
Marilyn Day; Evelyn Griesse; and Marilyn
Fusfield, Appellants,
v.
SIOUX FALLS SCHOOL DISTRICT 49-5; Richard L. Bohy, President
of the Board of Education; Doris Larson, David Brandt, Pam
Nelson and John Simko, Jr., Members of the Board of
Education and Dr. John W. Harris, Superintendent of Schools
and their agents, employees and successors, Appellees.
 No. 79-1277.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 11, 1979.
Decided April 22, 1980.
Rehearing and Rehearing En Banc Denied May 20, 1980.
 
 Stephen L. Pevar, Regional Counsel, American Civil Liberties Union, Denver, Colo., for appellants.
 Deming Smith and Robert E. Hayes, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., for appellees; Michael F. Pieplow, Sioux Falls, S. D., on brief.
 Gaylen J. Byker, George Wilson McKeag and Gregory M. Harvey, Philadelphia, Pa., on brief, for amicus, United Presbyterian Church.
 Robert Senghas, Executive Vice President, Unitarian Universalist Association, Boston, Mass., on brief, for amicus, Unitarian Universalist Association.
 Martin B. Cowan, Jeffrey P. Sinensky and Richard A. Weisz, New York City, on brief, for amicus, National Jewish Commission, et al.
 Marc D. Stern, American Jewish Congress, New York City, on brief, for amicus, American Jewish Congress.
 Before HEANEY, ROSS and McMILLIAN, Circuit Judges.
 HEANEY, Circuit Judge.
 
 I.
 
 1
 In response to complaints that public school Christmas assemblies in 1977 and prior years constituted religious exercises, the School Board of Sioux Falls, South Dakota, set up a citizens' committee to study the relationship between church and state as applied to school functions.[1] The committee's deliberations, which lasted for several months, culminated in the formulation of a policy statement and set of rules outlining the bounds of permissible school activity. After a public hearing, the School Board adopted the policy statement and rules recommended by the committee.[2]
 
 
 2
 The appellants brought suit for declaratory and injunctive relief, alleging that the policy statement and the rules adopted by the School Board violate the Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution. The district court reviewed the practices of the Sioux Falls School District and found that the 1977 Christmas program that was the subject of the initial complaints "exceeded the boundaries of what is constitutionally permissible under the Establishment Clause." The court also found, however, that programs similar to the 1977 Christmas program would not be permitted under the new School Board guidelines and concluded that the new rules, if properly administered and narrowly construed, would not run afoul of the First Amendment. Florey v. Sioux Falls Sch. Dist. 49-5, 464 F.Supp. 911 (D.S.D.1979).
 
 
 3
 The appellants' claim is that the School Board policy and rules are unconstitutional both on their face and as applied. At the time of the district court proceeding, however, no holiday season had passed with the rules in effect. Consequently, little evidence was presented on the actual implementation of the rules, and the district court made no findings in that regard. The record does contain some evidence of the interpretation given the rules by school administrators with respect to the Christmas holiday. We may consider that evidence, as well as the district court's observations on the 1977 Christmas program, in discerning the meaning of the rules, but because of the absence of district court findings on their application, we limit our review to the constitutionality of the rules on their face.
 
 II.
 
 4
 The close relationship between religion and American history and culture has frequently been recognized by the Supreme Court of the United States.[3] Nevertheless, the First Amendment to the Constitution explicitly prescribes the relationship between religion and government: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."[4] This apparently straightforward prohibition can rarely be applied to a given situation with ease, however. As the Supreme Court has noted, "total separation (between church and state) is not possible in an absolute sense." Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). As a result, the Court has developed a three-part test for determining when certain governmental activity falls within the constitutional boundaries:
 
 
 5
 First, the (activity) must have a secular * * * purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, * * * finally, the (activity) must not foster "an excessive governmental entanglement with religion."
 
 
 6
 Id. at 612-613, 91 S.Ct. at 2111 (quoting Walz v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)).
 
 
 7
 A. Purpose.
 
 
 8
 The appellants' contention that the School Board's adoption of the policy and rules was motivated by religious considerations is unsupportable. The record shows that the citizens' committee was formed and the rules drawn up in response to complaints that Christmas observances in some of the schools in the district contained religious exercises. The motivation behind the rules, therefore, was simply to ensure that no religious exercise was a part of officially sanctioned school activities. This conclusion is supported by the opening words of the policy statement: "It is accepted that no religious belief or non-belief should be promoted by the school district or its employees, and none should be disparaged." The statement goes on to affirmatively declare the purpose behind the rules:
 
 
 9
 The Sioux Falls School District recognizes that one of its educational goals is to advance the students' knowledge and appreciation of the role that our religious heritage has played in the social, cultural and historical development of civilization.
 
 
 10
 The express language of the rules also leads to the conclusion that they were not promulgated with the intent to serve a religious purpose. Rule 1 limits observation of holidays to those that have both a religious and a secular basis. Solely religious holidays may not be observed. Rule 3 provides that music, art, literature and drama having a religious theme or basis may be included in the school curriculum only if "presented in a prudent and objective manner and as a traditional part of the cultural and religious heritage of the particular holiday." Similarly, Rule 4 permits the use of religious symbols only as "a teaching aid or resource" and only if "such symbols are displayed as an example of the cultural and religious heritage of the holiday and are temporary in nature." We view the thrust of these rules to be the advancement of the students' knowledge of society's cultural and religious heritage, as well as the provision of an opportunity for students to perform a full range of music, poetry and drama that is likely to be of interest to the students and their audience.
 
 
 11
 This purpose is quite different from the express and implied intent of the states of New York, Pennsylvania and Maryland in the Supreme Court "School Prayer Cases." First, we emphasize the different character of the activities involved in those cases. The challenged law in Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), provided for the recitation of a state-authored prayer at the start of each school day. The Supreme Court had no difficulty characterizing this practice as a religious activity:
 
 
 12
 There can, of course, be no doubt that New York's program of daily classroom invocation of God's blessings as prescribed in the Regents' prayer is a religious activity. It is a solemn avowal of divine faith and supplication for the blessings of the Almighty. The nature of such a prayer has always been religious * * *.
 
 
 13
 Id. at 424-425, 82 S.Ct. at 1264.
 
 
 14
 Since prayer, by its very nature, is undeniably a religious exercise, the conclusion is inescapable that the advancement of religious goals was the purpose sought by the school officials in Engel. Indeed, the state officials published the prayer in a document entitled "Statement on Moral and Spiritual Training in the Schools." There can be little doubt that their intent was to promote "spiritual" ends.
 
 
 15
 Similarly, in Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), the Supreme Court emphasized the "pervading religious character of the ceremony" involving daily Bible reading in the schools. Id. at 224, 83 S.Ct. at 1572. Again, when a state intentionally sets up a system that by its essential nature serves a religious function, one can only conclude that the advancement of religion is the desired goal. As explained more fully in the next section of this opinion, however, the programs permitted under the Sioux Falls rules are not unquestionably religious in nature. Thus, we are not required to infer that the Sioux Falls School Board intended to advance religion.
 
 
 16
 Moreover, in the Supreme Court prayer cases, compulsory religious exercises were imposed on all schools by state law. The Sioux Falls rules, by contrast, do not require the individual schools to have holiday activities; they merely permit the inclusion of certain programs in the curriculum in the event that classroom teachers feel that such programs would enhance their overall instructional plan. The rules are an attempt to delineate the scope of permissible activity within the district, not to mandate a statewide program of religious inculcation.
 
 
 17
 The appellants argue that the "legislative" history of Rule 1 compels the conclusion that the rule was designed to advance religion. The basis for this argument is a proposed amendment to Rule 1 introduced before both the citizens' committee and the School Board. The proposed amendment would have added to Rule 1 the following words: "Such observances shall be limited to secular aspects of these holidays." The amendment was defeated by both the citizens' committee and the School Board. The School Board rejected the proposal, appellants assert in their brief, "because it wanted to allow schools to observe the religious basis of holidays." This, they maintain, is an unconstitutional purpose.
 
 
 18
 We do not agree that the rejection of the proposed amendment renders the School Board rules constitutionally infirm. First, the record is devoid of evidence indicating the reasons the proposal was rejected. A number of possibilities suggest themselves, including the ambiguity of the proposed addition. The appellants' assertion that the rejection was due to the School Board's desire "to observe the religious basis of holidays" is thus unsupported. Furthermore, even if the appellants' contention were correct, the Constitution does not necessarily forbid the use of materials that have a "religious basis." Government involvement in an activity of unquestionably religious origin does not contravene the Establishment Clause if its "present purpose and effect" is secular. McGowan v. Maryland, 366 U.S. 420, 445, 81 S.Ct. 1101, 1115, 6 L.Ed.2d 393 (1961). Thus, although the rules permit the schools to observe holidays that have both a secular and a religious basis, we need not conclude that the School Board acted with unconstitutional motives. To the contrary, we agree with the district court's finding that the School Board did not adopt the policy statement and rules for the purpose of advancing or inhibiting religion.
 
 
 19
 B. Effect.
 
 
 20
 The appellants contend that, notwithstanding the actual intent of the School Board, the "principal or primary effect" of the rules is to either advance or inhibit religion. See Lemon v. Kurtzman, supra, 403 U.S. at 612, 91 S.Ct. at 2111. We cannot agree. The First Amendment does not forbid all mention of religion in public schools; it is the advancement or inhibition of religion that is prohibited. Committee for Public Education v. Nyquist, 413 U.S. 756, 788, 93 S.Ct. 2955, 2973, 37 L.Ed.2d 948 (1973). Hence, the study of religion is not forbidden "when presented objectively as part of a secular program of education." Abington School Dist. v. Schempp, supra, 374 U.S. at 225, 83 S.Ct. at 1573. We view the term "study" to include more than mere classroom instruction; public performance may be a legitimate part of secular study. This does not mean, of course, that religious ceremonies can be performed in the public schools under the guise of "study." It does mean, however, that when the primary purpose served by a given school activity is secular, that activity is not made unconstitutional by the inclusion of some religious content. As the district court noted in its discussion of Rule 3, "(t)o allow students only to study and not to perform (religious art, literature and music when) such works * * * have developed an independent secular and artistic significance would give students a truncated view of our culture." 464 F.Supp. at 916 (emphasis in original).
 
 
 21
 The appellants assert, however, that something more than secular study is authorized by the Sioux Falls rules. They point to Rule 1, which states that holidays that have a religious and secular basis may be "observed" in the public schools. "Observation," they maintain, necessarily connotes religious ceremony or exercise and the rule thus has the impermissible effect of advancing religion.
 
 
 22
 A review of the policy statement and rules as a whole leads us to conclude that the appellants' emphasis of the word "observe" is misplaced and their interpretation of it incorrect. First, as noted in section II.A. of this opinion, the rules must be read together with the policy statement of the School Board. That statement makes it clear that religion is to be neither promoted nor disparaged in the Sioux Falls schools. Consequently, any ambiguity in the meaning of the word "observed" must be resolved in favor of promoting that policy. Moreover, the only evidence presented on the definition of the word "observed" was the testimony of the School Superintendent, Dr. John Harris. Dr. Harris explained that "observed" means "that programs with content relating to both the secular and religious basis of (the holiday) could be performed, could be presented in the school." (Transcript at 65.) As noted earlier, we view performance or presentation to be a legitimate and important part of "study" in the public schools. Thus, the use of the word "observe" does not mean that the rules have the effect of advancing religion so long as the religious content of the programs is "presented objectively as part of a secular program of education." Abington School Dist. v. Schempp, supra, 374 U.S. at 225, 83 S.Ct. at 1573.
 
 
 23
 To determine whether religion is advanced or inhibited by the rules, then, we must look to see if a genuine "secular program of education" is furthered by the rules. It is unquestioned that public school students may be taught about the customs and cultural heritage of the United States and other countries. This is the principal effect of the rules. They allow the presentation of material that, although of religious origin, has taken on an independent meaning.
 
 
 24
 The district court expressly found that much of the art, literature and music associated with traditional holidays, particularly Christmas, has "acquired a significance which is no longer confined to the religious sphere of life. It has become integrated into our national culture and heritage."[5] Furthermore, the rules guarantee that all material used has secular or cultural significance: Only holidays with both religious and secular bases may be observed; music, art, literature and drama may be included in the curriculum only if presented in a prudent and objective manner and only as a part of the cultural and religious heritage of the holiday; and religious symbols may be used only as a teaching aid or resource and only if they are displayed as a part of the cultural and religious heritage of the holiday and are temporary in nature. Since all programs and materials authorized by the rules must deal with the secular or cultural basis or heritage of the holidays and since the materials must be presented in a prudent and objective manner and symbols used as a teaching aid, the advancement of a "secular program of education," and not of religion, is the primary effect of the rules.
 
 
 25
 The appellants argue that, despite the secular benefits, inclusion of material with a religious theme, basis or heritage invalidates the rules. In support of this assertion, the appellants point out that several of appellants' witnesses, all of them ordained clergymen, testified that the singing of Christmas carols would have some religious effect on them. But the appellants misread the test laid down by the Supreme Court. As noted, Lemon v. Kurtzman, supra, permits a given activity if "its principal or primary effect (is) one that neither advances nor inhibits religion." 403 U.S. at 612, 91 S.Ct. at 2111 (emphasis added). It would be literally impossible to develop a public school curriculum that did not in some way affect the religious or nonreligious sensibilities of some of the students or their parents. School administrators should, of course, be sensitive to the religious beliefs or disbeliefs of their constituents and should attempt to avoid conflict,[6] but they need not and should not sacrifice the quality of the students' education. They need only ensure that the primary effect of the school's policy is secular. The district court's finding that they have done this by the challenged rules is not clearly erroneous.
 
 
 26
 The distinction between an activity that primarily advances religion and one that falls within permissible constitutional limits may be illustrated by comparing the 1977 kindergarten Christmas program found by the district court to be an impermissible religious activity and the programs authorized by the new School Board guidelines. The 1977 program at one of the elementary schools contained a segment that, in the words of the district court, "was replete with religious content including a responsive discourse between the teacher and the class entitled, 'The Beginners Christmas Quiz.' " The "Quiz" read as follows:Teacher: Of whom did heav'nly angels sing,
 
 
 27
 And news about His birthday bring?
 
 
 28
 Class: Jesus.
 
 Teacher: Now, can you name the little town
 
 29
 Where they the Baby Jesus found?
 
 
 30
 Class: Bethlehem.
 
 Teacher: Where had they made a little bed
 
 31
 For Christ, the blessed Saviour's head?
 
 
 32
 Class: In a manger in a cattle stall.
 
 Teacher: What is the day we celebrate
 
 33
 As birthday of this One so great?
 
 
 34
 Class: Christmas.
 
 
 35
 This "Quiz" and other similar activities constituted, the district court found, "a predominately religious activity" which exceeded constitutional bounds. We agree with this characterization and with the district court's observation that similar programs would be prohibited by the new rules. The administration of religious training is properly in the domain of the family and church. The First Amendment prohibits public schools from serving that function.
 
 
 36
 C. Entanglement.
 
 
 37
 The appellants contend that the new guidelines in Sioux Falls unconstitutionally "foster 'an excessive government entanglement with religion.' " See Lemon v. Kurtzman, supra, 403 U.S. at 613, 91 S.Ct. at 2111. All the Supreme Court cases cited by the appellants in support of the "entanglement" test deal with governmental aid to sectarian institutions, not with the permissible scope of activity in the public schools. In a "parochaid" case, the court is presented with a situation in which the state is involving itself with a concededly religious activity or institution. The real danger is the potential for state repression of such institutions. In the present case, by contrast, the school district is called upon to determine whether a given activity is religious. This type of decision inheres in every curriculum choice and would be faced by school administrators and teachers even if the rules did not exist. Indeed, the rules are guidelines designed to aid in the decisionmaking process. Rather than entangling the schools in religion, the rules provide the means to ensure that the district steers clear of religious exercises. We think the district court was correct in finding that the new rules do not unconstitutionally entangle the Sioux Falls school district in religion or religious institutions.
 
 III.
 
 38
 The appellants also contend that implementation of the policy and rules of the Sioux Falls School Board should be enjoined because the rules violate the Free Exercise Clause of the First Amendment. This contention does not withstand scrutiny.[7]
 
 
 39
 The public schools are not required to delete from the curriculum all materials that may offend any religious sensibility. As Mr. Justice Jackson noted in McCollum v. Board of Education, 333 U.S. 203, 235, 68 S.Ct. 461, 477, 92 L.Ed. 649 (1948),
 
 
 40
 Authorities list 256 separate and substantial religious bodies to exist in the continental United States. Each of them * * * has as good a right as this plaintiff to demand that the courts compel the schools to sift out of their teaching everything inconsistent with its doctrines. If we are to eliminate everything that is objectionable to any of these warring sects or inconsistent with any of their doctrines, we will leave public education in shreds.
 
 
 41
 These inevitable conflicts with the individual beliefs of some students or their parents, in the absence of an Establishment Clause violation, do not necessarily require the prohibition of a school activity. On the other hand, forcing any person to participate in an activity that offends his religious or nonreligious beliefs will generally contravene the Free Exercise Clause, even without an Establishment Clause violation. See Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In this case, however, the Sioux Falls School Board recognized that problem and expressly provided that students may be excused from activities authorized by the rules if they so choose.[8]
 
 IV.
 
 42
 We recognize that this opinion affirming the district court will not resolve for all times, places or circumstances the question of when Christmas carols, or other music or drama having religious themes, can be sung or performed by students in elementary and secondary public schools without offending the First Amendment. The constitutionality of any particular school activity conducted pursuant to the rules, in association with any particular holiday, cannot be determined unless and until there is a specific challenge, supported by evidence, to the school district's implementation of the rules. We simply hold, on the basis of the record before us, that the policy and rules adopted by the Sioux Falls Board of Education, when read in the light of the district court's holding that segments of the 1977 Christmas program at one of the elementary schools were impermissible, are not violative of the First Amendment.[9]
 
 
 43
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 APPENDIX
 I. POLICY
 
 44
 Recognition of Religious Beliefs and Customs
 
 
 45
 It is accepted that no religious belief or non-belief should be promoted by the school district or its employees, and none should be disparaged. Instead, the school district should encourage all students and staff members to appreciate and be tolerant of each other's religious views. The school district should utilize its opportunity to foster understanding and mutual respect among students and parents, whether it involves race, culture, economic background or religious beliefs. In that spirit of tolerance, students and staff members should be excused from participating in practices which are contrary to their religious beliefs unless there are clear issues of overriding concern that would prevent it.
 
 
 46
 The Sioux Falls School District recognizes that one of its educational goals is to advance the students' knowledge and appreciation of the role that our religious heritage has played in the social, cultural and historical development of civilization.
 
 II. RULES
 Observance of Religious Holidays
 
 47
 The practice of the Sioux Falls School District shall be as follows:
 
 
 48
 1. The several holidays throughout the year which have a religious and a secular basis may be observed in the public schools.
 
 
 49
 2. The historical and contemporary values and the origin of religious holidays may be explained in an unbiased and objective manner without sectarian indoctrination.
 
 
 50
 3. Music, art, literature and drama having religious themes or basis are permitted as part of the curriculum for school-sponsored activities and programs if presented in a prudent and objective manner and as a traditional part of the cultural and religious heritage of the particular holiday.
 
 
 51
 4. The use of religious symbols such as a cross, menorah, crescent, Star of David, creche, symbols of Native American religions or other symbols that are a part of a religious holiday is permitted as a teaching aid or resource provided such symbols are displayed as an example of the cultural and religious heritage of the holiday and are temporary in nature. Among these holidays are included Christmas, Easter, Passover, Hannukah, St. Valentine's Day, St. Patrick's Day, Thanksgiving and Halloween.
 
 
 52
 5. The school district's calendar should be prepared so as to minimize conflicts with religious holidays of all faiths.
 
 Religion in the Curriculum
 
 53
 Religious institutions and orientations are central to human experience, past and present. An education excluding such a significant aspect would be incomplete. It is essential that the teaching about and not of religion be conducted in a factual objective and respectful manner.
 
 
 54
 Therefore, the practice of the Sioux Falls School District shall be as follows:
 
 
 55
 1. The District supports the inclusion of religious literature, music, drama and the arts in the curriculum and in school activities provided it is intrinsic to the learning experience in the various fields of study and is presented objectively.
 
 
 56
 2. The emphasis on religious themes in the arts, literature and history should be only as extensive as necessary for a balanced and comprehensive study of these areas. Such studies should never foster any particular religious tenets or demean any religious beliefs.
 
 
 57
 3. Student-initiated expressions to questions or assignments which reflect their beliefs or non-beliefs about a religious theme shall be accommodated. For example, students are free to express religious belief or non-belief in compositions, art forms, music, speech and debate.
 
 Dedications and Commencement
 
 58
 Traditions are a cherished part of the community life and the Sioux Falls School District expresses an interest in maintaining those traditions which have had a significance to the community. Such ceremonies should recognize the religious pluralism of the community.
 
 
 59
 Therefore, the practice of the Sioux Falls School District shall be as follows:
 
 
 60
 1. A dedication ceremony should recognize the religious pluralism of the community and be appropriate to those who use the facility. An open invitation should be extended to all citizens to participate in the ceremony.
 
 
 61
 2. Traditions, i. e., invocation and benediction, inherent in commencement ceremonies, should be honored in the spirit of accommodation and good taste.
 
 
 62
 3. Because the baccalaureate service is traditionally religious in nature, it should be sponsored by agencies separate from the Sioux Falls School District.
 
 
 63
 McMILLIAN, Circuit Judge, dissenting.
 
 
 64
 I dissent. Before discussing the three-part Establishment Clause test and applying its analysis to this case, I would note that this case involves a close question in one of the most sensitive areas of constitutional law, the relationship between religion and public education.[1] The Supreme Court's Establishment Clause cases have developed "controlling constitutional standards (which) have become firmly rooted and the broad contours . . . are now well defined," Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 761, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973) (Nyquist ), but those standards are not easily applied and the precedents do not squarely address this case. This is not a financial aid case; rather, this is a variation of the school prayer (Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962)) and Bible reading (School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Schempp )) cases. Preparing and presenting Christmas assemblies is not a religious activity in the obvious sense that reciting a nondenominational prayer or reading from the Bible are religious activities. Prayer is "a solemn avowal of divine faith and supplication for the blessings of the Almighty." Engel v. Vitale, supra, 370 U.S. at 424, 82 S.Ct. at 1264. Similarly, reading from the Bible is a religious exercise.[2] Schempp, supra, 374 U.S. at 224, 83 S.Ct. at 1572. When compared with school prayers or Bible reading, Christmas assemblies, and in particular the singing of Christmas carols, appear ambiguous in character. Nonetheless, I am of the opinion that the preparation and presentation of Christmas assemblies in the public schools violates the Establishment Clause.
 
 
 65
 "The problem, like many problems in constitutional law, is one of degree." Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). I quite agree with the majority that singing Christmas carols in the public schools is not necessarily a violation of the Establishment Clause. At 1315-1316. "(N)ot every involvement of religion in public life is unconstitutional . . . ." Schempp, supra, 374 U.S. at 232, 83 S.Ct. at 1576 (Brennan, J., concurring). As noted by the majority, the Christmas carol is a music form which is undoubtedly worthy of study. At 1316-1317 n.5. Nothing in my analysis should be taken to mean that the study of Christmas carols and other Christmas traditions, "when presented objectively as part of a secular program of education, may not be effected consistently with the First Amendment." Schempp, supra, 374 U.S. at 225, 83 S.Ct. at 1573. "Music without sacred music, architecture minus the cathedral, or painting without the scriptural themes would be eccentric and incomplete, even from a secular point of view." Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 236, 68 S.Ct. 461, 477, 92 L.Ed. 649 (1948) (Jackson, J., concurring) (McCollum ). Similarly, western European history would be incomplete without the Crusades, the Inquisition or the Reformation, as would early American history (and the history of the Establishment Clause itself, see Nyquist, supra, 413 U.S. at 770 n. 28, 93 S.Ct. at 2964) without the Puritans, the Quakers or the Transcendentalists. To return to the metaphor of music, nothing in my analysis would limit a music curriculum to fugues and minuets, see Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971) (Lemon ), and exclude oratorios.
 
 I. The Three-part Test
 
 66
 The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion . . . ." U.S.Const. amend I. Although phrased in absolute terms, the Establishment Clause has never been held to require "total separation" of church and state in an absolute sense. Lemon, supra, 403 U.S. at 614, 91 S.Ct. at 2112; cf. McDaniel v. Paty, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (state statute barring the clergy from public office held unconstitutional). However, the Establishment Clause definitely has "a secular reach far more penetrating in the conduct of Government than merely to forbid an 'established church.' " McCollum, supra, 333 U.S. at 213, 68 S.Ct. at 466 (Frankfurter, J., concurring).[3] The line of separation is certainly neither straight nor easily determined. See Committee for Public Education & Religious Liberty v. Regan, --- U.S. ---- - ----, 100 S.Ct. 840, 851, 63 L.Ed.2d 94 (1980) (Blackmun, J., dissenting) (Regan ) ("the wavering line" separating church and state). As described in Lemon, supra, 403 U.S. at 614, 91 S.Ct. at 2112, "the line of separation, far from being a (high and impregnable) 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." Although in my view the line of separation has become unnecessarily blurred,
 
 
 67
 (t)he fact is that the line which separates the secular from the sectarian in American life is elusive. The difficulty of defining the boundary with precision inheres in a paradox central to our scheme of liberty. While our institutions reflect a firm conviction that we are a religious people, those institutions by solemn constitutional injunction may not officially involve religion in such a way as to prefer, discriminate against, or oppress, a particular sect or religion.
 
 
 68
 Schempp, supra, 374 U.S. at 231, 83 S.Ct. at 1576 (Brennan, J., concurring). Further, "(n)either (a state nor the federal government) can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." Torcaso v. Watkins, 367 U.S. 488, 495, 81 S.Ct. 1680, 1683-1684, 6 L.Ed.2d 982 (1961) (citations and footnotes omitted). "By reason of the First Amendment government is commanded 'to have no interest in theology or ritual,' for on those matters 'government must be neutral.' " Engel v. Vitale, supra, 370 U.S. at 443, 82 S.Ct. at 1273 (Douglas, J., concurring), citing McGowan v. Maryland, 366 U.S. 420, 453, 81 S.Ct. 1101, 1119, 6 L.Ed.2d 393 (1961) (Douglas, J., dissenting).
 
 
 69
 The focus of an Establishment Clause analysis is whether the challenged action involves "the three main concerns against which the Establishment Clause sought to protect: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' " Tilton v. Richardson, 403 U.S. 672, 677, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971) citing Walz v. Tax Commissioner, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970).
 
 
 70
 The mode of analysis for Establishment Clause questions is defined by the three-part test that has emerged from (the Supreme) Court's decisions. In order to pass muster, a statute must have a secular legislative purpose, must have a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive government entanglement with religion.
 
 
 71
 Wolman v. Walter, 433 U.S. 229, 235-36, 97 S.Ct. 2593, 2599, 53 L.Ed.2d 714 (1977), citing Roemer v. Maryland Public Works Board, 426 U.S. 736, 748, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976); Nyquist, supra, 413 U.S. at 772-73, 93 S.Ct. at 2965-2966; Lemon, supra, 403 U.S. at 612-13, 91 S.Ct. at 2111. The three-part test "has been clearly stated, if not easily applied." Meek v. Pittenger, 421 U.S. 349, 358, 95 S.Ct. 1753, 1759, 44 L.Ed.2d 217 (1975). In recent Supreme Court cases it has been applied to "those (cases) involving public aid in varying forms to sectarian educational institutions," the second of the two general categories of religion and education cases raising Establishment Clause questions identified by Mr. Justice Powell in Nyquist, supra, 413 U.S. at 772, 93 S.Ct. at 2965 (footnote omitted). At issue here is the first category: "those (cases) dealing with religious activities within the public schools." Id. (footnote omitted); cf. Lanner v. Wimmer, 463 F.Supp. 867, 881 (D. Utah 1978) (accreditation of Bible history classes by public school held to violate Establishment Clause). The action challenged here is necessarily less substantive than the kind of action at issue in the financial aid cases, but the tests of secular legislative purpose, impermissible effect, and excessive entanglement are equally applicable. "(T) hese tests or criteria should be 'viewed as guidelines' within which to consider 'the cumulative criteria developed over many years and applying to a wide range of governmental action challenged as violative of the Establishment Clause.' " Id. 413 U.S. at 773 n.31, 93 S.Ct. at 2965 n.31, citing Tilton v. Richardson, supra, 403 U.S. at 677-78, 91 S.Ct. at 2095-2096; see also Meek v. Pittenger, supra, 421 U.S. at 358-59, 95 S.Ct. at 1759-1760.
 
 
 72
 As noted by the majority, there was little evidence presented below about the actual implementation of the school district's policy and rules for the observance of religious holidays. At 1313. At the center of the controversy in the present case is the Christmas assembly. At oral argument counsel for the school district and for appellants supplied a few additional details about the Christmas assemblies. The other holiday observances were not discussed. The contents of the Christmas holiday observances varies from teacher to teacher; the complexity of the material depends upon the grade level; the lower grades tend to have class parties while the upper grades tend to have school assemblies; the assemblies are typically concerts which feature traditional Christmas music and songs, including Christmas carols such as "Silent Night" and "O Come All Ye Faithful"; the assemblies are usually held during the evening at the particular school; assembly attendance is not compulsory and students could excuse themselves; assembly activity is not graded but assembly preparation is part of the general classroom work and may involve as much as two months of the school year (this time is, of course, not devoted entirely to assembly preparation). This kind of Christmas assembly is a traditional feature in many public schools and in many communities across the country. However, widespread observance or "mere longevity of custom does not in itself insulate a practice from constitutional scrutiny." Fox v. City of Los Angeles, 22 Cal.App.3d 792, 587 P.2d 663, 671, 150 Cal.Rptr. 867, 875 (1978) (banc) (Bird, C. J., concurring) (cross displayed in city hall windows at Easter enjoined as violation of Establishment Clause in state constitution), citing 70 Cal.App.3d 885, 139 Cal.Rptr. 180, 184 (App.1977). "(H)istorical acceptance without more (does) not alone (suffice), as 'no one acquires a vested or protected right in violation of the Constitution by long use.' " Nyquist, supra, 413 U.S. at 792, 93 S.Ct. at 2975, citing Walz v. Tax Commissioner, supra, 397 U.S. at 678, 90 S.Ct. at 1416.
 
 II. The Secular Legislative Purpose Test
 
 73
 First, I am not totally persuaded that the policy and rules reflect a clearly secular legislative purpose. It cannot be overlooked that complaints about the religious content of several Christmas assemblies prompted the formation of the citizens' advisory committee and the adoption of the policy and rules by the school board. Against this background I am inclined to view the school board's rejection of the proposed "secular aspects only" amendment as indicative of a purpose to permit more than the study (including performance when appropriate) of religion, subjects with religious content or significance and religious traditions. Cf. Meltzer v. Board of Education, 577 F.2d 311, 317 (5th Cir. 1978) (banc) (Brown, C. J., dissenting in part) (majority upheld guidelines for distribution of religious literature in public schools against Establishment Clause attack), cert. denied, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). In addition, the rules refer exclusively to "religious holidays." No doubt this singular orientation reflects the non-existence of agnostic or atheistic occasions. The rules do not address the observance of non-religious holidays, such as Veterans Day, Arbor Day, Memorial Day, Labor Day, the birthdays of various presidents or civic leaders (i. e. the controversy over whether Martin Luther King's birthday should be a holiday). To the extent the policy and rules focus only on religious holidays, I would find the policy and rules unconstitutionally operate as a preference of religion.
 
 
 74
 Like the majority, I too accept "the thrust of these rules to be the advancement of the students' knowledge of society's cultural and religious heritage." At 1314. The opening words of the policy statement takes the commendable position that "no religious belief or non-belief should be promoted by the school district or its employees, and none should be disparaged." At 1319 (Appendix). I do not deny that knowledge of society's cultural and religious heritage and the encouragement of tolerance (religious and other kinds) and mutual understanding are admirable secular goals. However, I find several problems in the relationship between the rules and these secular goals. First, I do not understand how the observance of religious holidays promotes these secular goals. Moreover, I do not understand how the observance of particular religious holidays (i. e. Christian and Jewish holidays; but see note 4 infra ), but not others (i. e., Ramadan, North American Indian holidays, Hindu holidays) encourages student knowledge and appreciation of religious and cultural diversity. For example, the observance of the holidays of religions less familiar to most American public school children than either Christian or Jewish holidays would seem more likely to increase student knowledge and promote religious tolerance.
 
 
 75
 Second, even assuming the observance of religious holidays does advance these secular goals, those secular goals can be achieved in public education without the "observance" of religious holidays. As Mr. Justice Brennan observed in Schempp,
 
 
 76
 Torcaso and the Sunday Law Cases forbid the use of religious means to achieve secular ends where nonreligious means will suffice. . . . While I do not question the judgment of experienced educators that the challenged practices (Bible reading) may well achieve valuable secular ends (fostering harmony and tolerance among the pupils, enhancing the authority of the teacher, and inspiring better discipline), it seems to me that the State acts unconstitutionally if it either sets about to attain even indirectly religious ends by religious means, or if it uses religious means to serve secular ends where secular means would suffice.
 
 
 77
 374 U.S. at 281, 83 S.Ct. at 1603. Here the school district seeks to accomplish secular goals by religious means, the observance of religious holidays. Surely the school district can advance student knowledge and tolerance of religious diversity as effectively by non religious means, that is, through the study of comparative religions or as part of the history or social studies curriculum. In any case, the observance of religious holidays as a means of accomplishing the secular goals of knowledge and tolerance clearly discriminates against non-belief.
 
 
 78
 Third, even if the secular goals of student knowledge and religious tolerance are promoted by religious means and nonreligious means are inadequate, why should the rules limit such observance only to those holidays which have "a religious and a secular basis"? Why require these holidays to have a secular basis at all? Ostensibly it is the religious basis of these particular holidays (and the different religions thus represented) which is critical to the promotion of student knowledge and tolerance of religious diversity. In this context, a particular holiday's secular basis is irrelevant. Nonetheless, the inclusion of a secular basis requirement does balance and diffuse the religious basis requirement and thereby appears, at first glance, to shield the rules from constitutional attack.
 
 
 79
 Finally, the rules state that several holidays have "a religious and a secular basis" but fail to explain what is meant by those terms. The rules identify such holidays as Christmas, Easter, Passover, Chanukah, Valentine's Day, St. Patrick's Day, Thanksgiving, and Halloween. On the one hand, I find it very difficult to articulate exactly what is meant by "secular basis" and to discern the secular basis of some of the holidays (i. e. Easter). Secular basis presumably refers to something other than religiously neutral symbols (i. e. snowmen and jingle bells instead of Nativity scenes and the Star of Bethlehem), association with majoritarian (Christian) cultural traditions, commercialization, or observance contemporaneous with Christian religious holidays.[4]
 
 
 80
 On the other hand, I find it equally difficult to ascertain what is meant by "religious basis," particularly as applied to holidays like Valentine's Day. Valentine's Day does have a certain degree of secular (and commercial) significance as an occasion for the exchange of expressions of love and affection. However, the religious origin of Valentine's Day can only be characterized as remote (it is the name day of a Roman Christian martyr of the second century AD) and its contemporary religious significance minimal. The same observation is more or less true of St. Patrick's Day and Halloween, particularly insofar as those holidays are "celebrated" today. Furthermore, the "religious basis" of the holidays listed in the rules varies rather markedly, for example, from Valentine's Day to Easter. In fact, Thanksgiving arguably seems to me the one holiday listed in the rules which has both a discernible secular and religious basis; Thanksgiving commemorates an event of some significance (perhaps apocryphal) in early American colonial history and is a national holiday set aside for giving thanks to God. Thanksgiving is a federal legal public holiday. See 5 U.S.C. § 6103(a).
 
 
 81
 Christmas is especially difficult. Despite its many and diverse secular manifestations, Christmas remains an event of immense and undiminished significance to Christians: the celebration of the birth of Christ. Cf. McGowan v. Maryland, supra, 366 U.S. at 431-53, 81 S.Ct. at 1108-1119 (Sunday closing laws upheld as establishing uniform day-of-rest and recreation with only remote or incidental religious benefit). Unlike Thanksgiving, Christmas has no inherent secular basis as the anniversary of an American historical event. Christmas has nonetheless acquired an undeniable secular importance and general acceptance as a holiday season over the years. As noted in Allen v. Morton, 161 U.S.App.D.C. 239, 495 F.2d 65 (1973), which involved an Establishment Clause challenge to the annual "Christmas Pageant of Peace" celebrated on federal parkland adjacent to the White House that included the display of a life-size Nativity scene or "creche," Christmas holiday observances are often associated with the laudable secular theme of expressing a national desire for "Peace on Earth, Goodwill Toward Men." Id. at 69. Christmas is also a federal legal public holiday, 5 U.S.C. § 6103(a), and is observed directly and indirectly in many government activities: for example, the President lights a national Christmas tree, the post office issues commemorative stamps for the Christmas season which feature artwork with Christian themes, local governments display Christmas trees and Christmas decorations on public buildings, city streets and city squares.
 
 
 82
 Nonetheless, what is constitutionally unobjectionable for adults or in a non-public school context, but see Fox v. City of Los Angeles, supra, 587 P.2d at 666, 150 Cal.Rptr. at 870, may be prohibited for public school children. See, e. g., Tilton v. Richardson, supra, 403 U.S. at 685, 91 S.Ct. at 2099 (Burger, C. J.) (distinction between elementary and secondary education and university education); Schempp, supra, 374 U.S. at 294-300, 83 S.Ct. at 1612 (Brennan, J., concurring) ("Of special significance to this distinction is the fact that we are here usually dealing with adults, not with impressionable children as in the public schools."). To the extent the school district seeks to justify the observance of the Christmas holiday as an occasion to advance the students' knowledge of cultural and religious knowledge, diversity, and tolerance or to promote peace among mankind,[5] these objectives could be accomplished by the observance of a more neutral "holiday," for example United Nations Day. "Such substitutes would, I think, be unsatisfactory or inadequate only to the extent that the present activities do in fact serve religious goals." Schempp, supra, 374 U.S. at 281, 83 S.Ct. at 1602-1603 (Brennan, J., concurring).
 
 
 83
 Even assuming the school board acted with a secular legislative purpose, "the propriety of a legislature's purposes may not immunize from further scrutiny a law which either has a primary effect that advances religion, or which fosters excessive entanglements between Church and State." Nyquist, supra, 413 U.S. at 774, 93 S.Ct. at 2966.
 
 III. The Primary Effect Test
 
 84
 Second, do the rules, particularly to the extent they permit the preparation and presentation of Christmas assemblies, have a principal or primary effect which either advances or inhibits religion? Unlike the majority, I think they do. Christmas assemblies have a substantial impact, both in favor of one religion and against other religions and nonbelief, on the school district employees, the students, the parents and relatives of the students and the community.
 
 
 85
 When a (school district) so openly promotes the religious meaning of one religion's holidays, the benefit reaped by that religion and the disadvantage suffered by other religions is obvious. Those persons who do not share those holidays are relegated to the status of outsiders by their own government; those persons who do observe those holidays can take pleasure in seeing . . . their belief given official sanction and special status.
 
 
 86
 Fox v. City of Los Angeles, supra, 587 P.2d at 670, 150 Cal.Rptr. at 874 (Bird, C. J., concurring). By sponsoring Christmas assemblies which feature programs of traditional Christmas music, including Christmas carols, only during the Christmas season, the school district has in effect endorsed the beliefs of one religion. The school district has placed "the power, prestige and financial support of government" behind the Christmas holiday. See Engel v. Vitale, supra, 370 U.S. at 430-31, 82 S.Ct. at 1267. The school district devotes considerable faculty time to the preparation and presentation of these assemblies; students expend considerable classroom time to the same end.
 
 
 87
 "The unconstitutionality of this practice crystallizes when we consider what is being displayed where and when." Fox v. City of Los Angeles, supra, 587 P.2d at 670, 150 Cal.Rptr. at 874 (Bird, C. J., concurring) (emphasis in original). Viewed in context, I do not think Christmas assemblies can accurately be described as merely arts festivals or choral concerts. These assemblies contain material that is unmistakably Christmas-oriented and are held only during the Christmas season, not in October or April. The programs of Christmas assemblies may include songs, poems or dramatic presentations, all of which may have artistic merit, but the subject and particularly the timing of these assemblies are no less revealing than the term "Christmas assembly." In contrast, Christmas carols presented as a music form could be performed at any time during the school year, not just at Christmas. Even though generally performed during the evening (when the school buildings are not being used educationally), assembly preparations are conducted in public school buildings, during the school day, by public school teachers.
 
 
 88
 It is not enough that the challenged action has a principal or primary effect that neither advances nor inhibits religion. Compare Lemon, supra, 403 U.S. at 612, 91 S.Ct. at 2111, with Nyquist, supra, 413 U.S. at 783-84 & n.39, 93 S.Ct. at 2971. The majority identifies the principal effect of the rules to be education about the customs and cultural heritage of the United States and other countries. Even accepting this characterization (I would emphasize instead the musical or dramatic impact of the Christmas assemblies) of the principal secular effect, this principal secular effect is not separable from the religious effect. Moreover, the religious effect is not "remote, indirect or incidental" to the secular effect. See generally L. Tribe, American Constitutional Law 840 (1978). In Nyquist, the Supreme Court cautioned against using the principal or primary effect test to make "metaphysical" distinctions between primary and secondary effects. 413 U.S. at 783-84 n.39, 93 S.Ct. at 2970-2971. The Supreme Court stated that "(o)ur cases simply do not support the notion that a law found to have a 'primary' effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion." Id. In other words, the primary effect test forbids any government action that has a substantial religious impact. See Meltzer v. Board of Education, supra, 577 F.2d at 318 (Brown, C. J., dissenting in part) (outlines a non-discriminatory impact principle), citing Gillette v. United States, 401 U.S. 437, 450, 91 S.Ct. 828, 836, 28 L.Ed.2d 168 (1971); Allen v. Morton, supra, 495 F.2d at 87 (Leventhal, J., concurring); Fox v. City of Los Angeles, supra, 587 P.2d at 673 & n.11, 150 Cal.Rptr. at 877 (Bird, C. J., concurring). As discussed above, I would find that Christmas assemblies do have a substantial religious (or non-secular) effect, an effect which cannot be "offset" by a primary secular effect under the formulation of the primary effect test set forth in Nyquist. I do not dispute that Christmas assemblies have secular effects (cultural education, promotion of religious diversity, musical and dramatic value); however, "(s)uch secular objectives, no matter how desirable and irrespective of whether judges might possess sufficiently sensitive calipers to ascertain whether the secular effects outweigh the sectarian benefits, cannot serve today any more than they could 200 years ago to justify such a direct and substantial advancement of religion." 413 U.S. at 785 n.39, 93 S.Ct. at 2971.
 
 IV. The Excessive Entanglement Test
 
 89
 Third, I think the rules necessarily foster an excessive entanglement of the school district with religion. As noted by the majority, the rules call upon the school district to determine whether a given activity is religious. At 1318.
 
 
 90
 The (school board) may also find itself effectively defining religion or censoring the content of religious materials. . . . (T)he secular public school system could become the focal point for the competition of all religious beliefs (and nonbelief). The courts and other state officials would be under a continuing duty to make certain that one faith was not in effect being endorsed and promoted by (the observance of religious holidays). Indeed, it is ironic that the more fairly and objectively the guidelines are enforced, the more the school board will become immersed in serious religious judgments.
 
 
 91
 Meltzer v. Board of Education, supra, 577 F.2d at 319 (Brown, C. J., dissenting in part). "A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that (the rules) are obeyed and the First Amendment otherwise respected." Lemon, supra, 403 U.S. at 619, 91 S.Ct. at 2114. Of course, it is precisely this type of "excessive and enduring entanglement between state and church," id., which is proscribed by the Establishment Clause.
 
 
 92
 (T)he Establishment Clause embodied the Framers' conclusion that government and religion have discrete interests which are mutually best served when each avoids too close a proximity to the other. It is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government. It has rightly been said of the history of the Establishment Clause that "our tradition of civil liberty rests not only on the secularism of a Thomas Jefferson but also on the fervent sectarianism . . . of a Roger Williams."
 
 
 93
 Schempp, supra, 374 U.S. at 259-60, 83 S.Ct. at 1591 (Brennan, J., concurring) (footnotes omitted), citing P. Freund, The Supreme Court of the United States 84 (1964).
 
 
 94
 In addition to administrative entanglement, the rules also enmesh the school district in another type of entanglement first articulated in Lemon, supra, 403 U.S. at 623, 91 S.Ct. at 2116, that is, "the potential for political divisiveness related to religious belief and practice." See also Meek v. Pittenger, supra, 421 U.S. at 372, 95 S.Ct. at 1766; Nyquist, supra, 413 U.S. at 797-98, 93 S.Ct. at 2978; see generally L. Tribe, American Constitutional Law 866 (1978). As in the case of financial aid to parochial schools, proponents in favor of religious holiday observances, opponents against religious holiday observances and advocates for specific religious (or non-religious) holidays will engage in considerable political activity either to elect school board members whose views are compatible with their own views or to influence the school board.
 
 
 95
 It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith.
 
 
 96
 Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect. The potential divisiveness of such conflict is a threat to the normal political process.
 
 
 97
 Lemon, supra, 403 U.S. at 622, 91 S.Ct. at 2116 (citations omitted).
 
 V. The Free Exercise Challenge
 
 98
 Appellants also argue that the rules on the observance of religious holidays violate the Free Exercise Clause. In view of my Establishment Clause analysis, I do not reach this issue. However, I do not agree with the majority that the availability of excusal from participation in activities authorized under the rules refutes the Free Exercise challenge. At 1318-1319.
 
 
 99
 (T)he excusal procedure itself necessarily operates in such a way as to infringe the rights of free exercise of those children who wish to be excused. (The Supreme Court) held in Barnette and Torcaso, respectively, that a State may require neither public school students nor candidates for an office of public trust to profess beliefs offensive to religious principles. By the same token the State could not constitutionally require a student to profess publicly his disbelief as the prerequisite to the exercise of his constitutional right of abstention. . . . (B)y requiring what is tantamount in the eyes of teachers and schoolmates to a profession of disbelief, or at least of nonconformity, the procedure may well deter those children who do not wish to participate for any reason based upon the dictates of conscience from exercising an indisputably constitutional right to be excused. Thus the excusal provision in its operation subjects them to a cruel dilemma. In consequence, even devout children may well avoid claiming their right and simply continue to participate in exercises distasteful to them because of an understandable reluctance to be stigmatized as atheists or nonconformists simply on the basis of their request.
 
 
 100
 Schempp, supra, 374 U.S. at 288-90, 83 S.Ct. at 1606-1607 (Brennan, J., concurring) (citations and footnotes omitted).
 
 VI. Conclusion
 
 101
 Of course, "every vestige, however slight, of cooperation or accommodation between religion and government" is not unconstitutional.[6] Id. at 294, 83 S.Ct. at 1609; cf. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (free exercise clause required accommodation of state unemployment compensation benefits program for member of Seventh Day Adventist Church); Zorach v. Clauson, supra, 343 U.S. at 312, 72 S.Ct. at 683 (released time for religious instruction off school premises). There is nothing unconstitutional about the use of religious subjects or materials in public schools as long as it is presented as part of a secular program of education. However, to the extent the policy and rules adopted by the Sioux Falls School District authorizes the observance of religious holidays, particularly Christmas assemblies, in a manner other than as part of a secular program of education, I would hold the policy and rules violate the Establishment Clause.
 
 
 102
 The above analysis may be regarded by some as hypersensitive or even antireligious. It is not. Judicial scrutiny of the relationship between religion and government must be particularly scrupulous in the context of the public school.
 
 
 103
 The secular public school did not imply indifference to the basic role of religion in the life of the people, nor rejection of religious education as a means of fostering it. The claims of religion were not minimized by refusing to make the public schools agencies for their assertion. The nonsectarian or secular public school was the means of reconciling freedom in general with religious freedom. The sharp confinement of the public schools to secular education was a recognition of the need of a democratic society to educate its children, insofar as the State undertook to do so, in an atmosphere free from pressures in a realm in which pressures are most resisted and where conflicts are most easily and most bitterly engendered. Designed to serve as perhaps the most powerful agency for promoting cohesion among a heterogeneous democratic people, the public school must keep scrupulously free from entanglement in the strife of sects. The preservation of the community from divisive conflicts, of Government from irreconcilable pressures by religious groups, of religion from censorship and coercion however subtly exercised, requires strict confinement of the State to instruction other than religious, leaving to the individual's church and home, indoctrination in the faith of his choice.
 
 
 104
 McCollum, supra, 333 U.S. at 216-17, 68 S.Ct. at 468 (Frankfurter, J., concurring).
 
 
 105
 It is implicit in the history and character of American public education that the public schools serve a uniquely public function: the training of American citizens in an atmosphere free of parochial, divisive, or separatist influences of any sort an atmosphere in which children may assimilate a heritage common to all American groups and religions. This is a heritage neither theistic nor atheistic, but simply civic and patriotic.
 
 
 106
 Schemmp, supra, 374 U.S. at 241-42, 83 S.Ct. at 1582 (Brennan, J., concurring) (citations omitted) (emphasis in original) (speaking in terms of division along religious lines).
 
 
 107
 I would reverse the judgment of the district court.
 
 
 
 [1]
 The committee consisted of the school district's director of music, Jewish, Catholic and Protestant clergy, an attorney, a member of the American Civil Liberties Union, and parents and teachers of students in the district
 
 
 [2]
 The policy statement and rules are set out in the appendix to this opinion. The rules challenged in this case are those contained under the heading "Observance of Religious Holidays."
 
 
 [3]
 See, e. g., Abington School Dist. v. Schempp, 374 U.S. 203, 212, 83 S.Ct. 1560, 1566, 10 L.Ed.2d 844 (1963) ("It is true that religion has been closely identified with our history and government."); Engel v. Vitale, 370 U.S. 421, 434, 82 S.Ct. 1261, 1268, 8 L.Ed.2d 601 (1962) ("The history of man is inseparable from the history of religion."); Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952) ("We are a religious people whose institutions presuppose a Supreme Being.")
 
 
 [4]
 The First Amendment has been made applicable to the states by the Fourteenth Amendment. Engel v. Vitale, supra, 370 U.S. at 422, 82 S.Ct. at 1262; Zorach v. Clauson, supra, 343 U.S. at 309, 72 S.Ct. at 681; Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)
 
 
 [5]
 The singing of "Christmas carols" appears to be a primary focal point of appellants' objections to the rules. These carols had their origin in England, France, Germany and other European countries. The first carols written in the United States appeared in the Nineteenth Century, but European carols were sung far earlier. The earliest printed collection of carols was published in 1521. Many of the popular carols of today, including Adeste Fideles, Hark the Herald Angels Sing and Joy to the World, were written in the early part of the Eighteenth Century. The most popular of all, Silent Night, Holy Night, was probably composed in Austria in 1818 and first published in 1840. Carols were banned for a period in the New England Colonies by the Puritans, but they have been sung in homes, schools, churches and public and private gathering places during the Christmas season in every section of the United States since that time. Today, carols are sung with regularity on public and commercial television and are played on public address systems in offices, manufacturing plants and retail stores in every city and village. See T. Coffin, The Book of Christmas Folklore (1973); R. Myers, Celebrations, The Complete Book of American Holidays; 5 Encyclopedia Americana 693 (International ed. 1968)
 Many carols have a religious theme; some do not. As in the centuries gone by, some persons object to the singing of carols with a religious basis in any place but the church or home because they feel that to do so debases religion; others have the same objection but because they feel it enhances religion. We take no part in this argument, it being entirely clear to us that carols have achieved a cultural significance that justifies their being sung in the public schools of Sioux Falls, South Dakota, if done in accordance with the policy and rules adopted by that school district.
 
 
 [6]
 In keeping with the goal of avoiding conflict with students' religious beliefs, the Sioux Falls policy statement includes the following:
 The school district should utilize its opportunity to foster understanding and mutual respect among students and parents, whether it involves race, culture, economic background or religious beliefs. In that spirit of tolerance, students and staff members should be excused from participating in practices which are contrary to their religious beliefs unless there are clear issues of overriding concern that would prevent it.
 The school district may, of course, excuse students from participating in this or any other school activity. But excusing students from participation does not solve Establishment Clause problems, Abington School Dist. v. Schempp, supra, 374 U.S. at 224-225, 83 S.Ct. at 1572-1573, and we find this aspect of the school district rules to be irrelevant to our Establishment Clause analysis.
 
 
 [7]
 The free exercise issue is stressed by amicus curiae, but it seems to have been added to the appellants' appeal brief as an afterthought. Neither the complaint, the trial briefs, nor the district court opinion mention the Free Exercise Clause; all are concerned only with the Establishment Clause
 
 
 [8]
 See note 6 supra
 
 
 [9]
 For a contrary view, see Note, Religious Holiday Observances in the Public Schools, 48 N.Y.U.L.Rev. 1116 (1973). The authors of that Note would permit programs relating to religious holidays but would prohibit the display of any religious art or symbols as a part of the program and would further prohibit the singing of carols or songs that express reverence to God, Jesus, Buddha, Mohammed, or any other religious prophet or leader
 
 
 [1]
 The Court's historic duty to expound the meaning of the constitution has encountered few issues more intricate or more demanding than that of the relationship between religion and the public schools. Since undoubtedly we are "a religious people whose institutions presuppose a Supreme Being," Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954, deep feelings are aroused when aspects of that relationship are claimed to violate the injunction of the First Amendment that government may make "no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." Americans regard the public schools as a most vital civic institution for the preservation of a democratic system of government. It is therefore understandable that the constitutional prohibitions encounter their severest test when they are sought to be applied in the school classroom
 School District v. Schempp, 374 U.S. 203, 230, 83 S.Ct. 1560, 1576, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring) (Schempp ).
 
 
 [2]
 Surely the place of the Bible as an instrument of religion cannot be gainsaid, and the State's recognition of the pervading religious character of the ceremony is evident from the rule's specific permission of the alternative use of the Catholic Douay version as well as the recent amendment permitting nonattendance at the exercises. None of these factors is consistent with the contention that the Bible is here used either as an instrument for nonreligious moral inspiration or as a reference for the teaching of secular subjects
 Schempp, supra, 374 U.S. at 224, 83 S.Ct. at 1572.
 
 
 [3]
 Its authors did not simply prohibit the establishment of a state church or a state religion, an area history shows they regarded as very important and fraught with great dangers. Instead they commanded that there should be "no law respecting an establishment of religion." A law may be one "respecting" the forbidden objective while falling short of its total realization. A law "respecting" the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not establish a state religion but nevertheless be one "respecting" that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment
 Lemon, supra, 403 U.S. at 612, 91 S.Ct. at 2111 (emphasis in original).
 
 
 [4]
 For example, Passover is often paired with Easter as is Chanukah with Christmas; however, Chanukah is not a major Jewish holiday and the rules, to the extent they suggest Chanukah has a religious significance to Jews comparable to that of Christmas to Christians, distort Judaism. Brief of American Jewish Congress as amicus curiae at 2 n.2. The rules do not include Rosh Hashanah or Yom Kippur
 
 
 [5]
 Likewise, in Schempp the school authorities argued that Bible-reading and other religious recitations in public schools served, primarily, secular purposes, including "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." 374 U.S. at 223; (83 S.Ct. at 1572)
 It may assist in providing a historical perspective to recall that the argument here is not a new one. The Preamble to Patrick Henry's Bill Establishing a Provision for Teachers of the Christian Religion, which would have required Virginians to pay taxes to support religious teachers and which became the focal point of Madison's Memorial and Remonstrance . . ., contained the following listing of secular purposes: "The general diffusion of Christian knowledge hath a natural tendency to correct the morals of men, restrain their vices, and preserve the peace of society . . . ."
 Nyquist, supra, 413 U.S. at 784-85 n.39, 93 S.Ct. at 2971 n.39 citing Everson v. Board of Education, 330 U.S. 1, 72-74, 67 S.Ct. 504, 538-539, 91 L.Ed. 711 (1947) (Appendix to dissent of Rutledge, J., reprinting the Bill in full).
 
 
 [6]
 For example, chaplains are provided in the armed forces and in prisons; public meetings (see Bogen v. Doty, 598 F.2d 1110 (8th Cir. 1979)) and legislative sessions are frequently opened by prayers; legislatures are served by chaplains; judicial sessions are opened with references to God; the currency of the Unites States carries the motto "In God We Trust;" businesses are closed by Sunday closing laws. See Schempp, supra, 374 U.S. at 296-304, 83 S.Ct. at 1610-1614 (Brennan, J., concurring); Engel v. Vitale, supra, 370 U.S. at 435 n.21, 82 S.Ct. at 1269; but cf. id. at 437-41 & nn.1-6, 82 S.Ct. at 1270-1272 (Douglas, J., concurring) ("Our system at the federal and state levels is presently honeycombed with (government financing of religious exercise).")